## W. H. ANDERSON CO. v. BALDWIN LAW PUB. CO.

Circuit Court of Appeals, Sixth Circuit. June 30, 1928.

No. 4689.

**1. Copyrights ⬤=83—Extreme brevity of alleged infringing annotated statute, contrasted with completeness of competing work, justifies exceptional emphasis on similarities as evidence of infringement.**

More than ordinary emphasis on similarities is justified, in determining whether an annotated statute infringes a competing work, by the fact that the alleged infringing work aims at extreme brevity, while the other aims at completeness of statement.

**2. Copyrights ⬤=55—Some similarity between annotated statute books having common basis in works of earlier annotators must be considered inevitable, in determining whether one infringes the other.**

A certain similarity of outline and subject-matter between annotated statute books having a common basis in the works of earlier annotators is to be considered inevitable, in determining whether the one edition infringes the copyright of the other.

**3. Courts ⬤=406(1¼)—That master did not hear witnesses will be considered on appeal, in determining weight to be accorded findings in infringement suit.**

The Circuit Court of Appeals, in determining the weight to be accorded to the findings of a special master, to whom were referred the testimony taken in court and exhibits in an infringement suit, for findings of fact and conclusions of law, will take into consideration the fact that the master did not hear the witnesses.

**4. Copyrights ⬤=83—High professional standing of persons connected with publication does not justify assumption it would have been almost impossible for them to infringe copyright.**

High professional standing of persons connected with the editing and publishing of an annotated statute book does not justify the assumption that it would have been almost impossible for them to have done anything amounting in law to infringement of copyright.

**5. Copyrights ⬤=83—Identity of language, similarity of ideas, or duplication of mistakes are not deprived of significance as evidence of infringement by showing other possible sources of material.**

The fact that the publisher of an annotated statute book can refer to portions of statutes, decisions, syllabi, or legal texts other than the work alleged to be infringed thereby as possible sources of material, does not deprive of significance on the question of infringement, identity of language, similarity of ideas, or duplication of mistakes.

**6. Copyrights ⬤=83—Inexplicable similarities are of cumulative effect as evidence of infringement.**

Many instances of inexplicable similarities are of cumulative effect in determining whether a work infringes a copyright.

**7. Copyrights ⬤=83—Identity of errors is significant evidence of infringement.**

Identity of errors is one of the most significant evidences of infringement.

**8. Copyrights ⬤=83—Errors in alleged infringing annotated statute book held to indicate copying.**

Numerous errors in an alleged infringing annotated statute book, which could not be accounted for in any other reasonable way than as copies of portions of a similar work, or at least as highly suggestive thereof, *held* clearly to indicate copying.

**9. Copyrights ⬤=83—Striking coincidences and and unmistakable improprieties held to show that annotator of alleged infringing statute book derived assistance from competing work.**

Striking coincidences and unmistakable improprieties, including verbatim copying of long annotations, and similarity of brief abstracts of a long decision, *held* to show that the annotator of an alleged infringing statute book at least derived assistance from the competing work.

**10. Copyrights ⬤=83—Similarities of statute numbers, in part official, in part conventional in scheme, held not significant evidence of infringement.**

Numbering, in statute book, of chapters and sections of the Ohio Code in the same way as in a competing work, *held* not important as evidence of infringement; most of the numbers being official, and the rest part of a conventional scheme.

**11. Copyrights ⬤=83—Identity of chapter heading, out of line with scheme of alleged infringing work, held to show copying.**

Identity of a chapter heading in two annotated statute books, thoroughly out of line with the usual scheme of the work alleged to infringe the copyright of the other, *held* clearly to show copying.

**12. Copyrights ⬤=83—Failure to annotate section codified subsequent to statute book aleged to be infringed held evidence of avoidance of independent labor.**

Failure in alleged infringing statute book to annotate a section which had been codified subsequent to the last supplement of the competing work, whose material therefore could not be utilized without complete redistribution, *held* to show avoidance of independent labor, justifying an inference that material which could be easily copied was in fact taken.

**13. Copyrights ⬤=83—Repetitions of peculiarities of citations held evidence that statute book infringed copyright.**

Repetitions of the peculiarities of citations contained in an annotated edition of statutes,

such as "O. S. U.," in contradistinction to the customary "O. S. O.," in referring to a certain report, *held* significant evidence of infringement.

**14. Copyrights ⊙83—Duplication of citations without occasion held evidence that statute book infringed copyright of competing work.**

Instances of duplication in an alleged infringing statute book, without occasion, of citations to the Ohio Law Bulletin, as practiced in the competing work at a date when the citations were timely, *held* evidence of infringement.

**15. Copyrights ⊙83—Evidence held to show copying and paraphrasing of original matter contained in statute book.**

Evidence, considered with special reference to the testimony of defendant's own witnesses, admissions by defendant's counsel, and comparison of publications, *held* to show copying and paraphrasing of original matter contained in a copyrighted annotated statute book, notwithstanding some similarities were capable of innocent explanation.

**16. Copyrights ⊙83—Methods of work followed in annotating statutes held such as would tend to cause appropriation.**

Methods of work followed in annotating statutes *held* to be such as to prompt annotators to appropriate ideas, both in literary expression and in designation of points of cases, from the competing work, whose copyright was alleged to be infringed.

**17. Copyrights ⊙22—Author may copyright work produced under contract, intent of parties being decisive.**

An author is not necessarily precluded from copyrighting a work produced under contract with another person, the intent of the parties as to which of them shall have the copyright being decisive.

**18. Copyrights ⊙24—Publisher, who contracted with state to prepare Code index for own and state publications, was independent contractor, within law of copyright.**

A private publisher, who contracted with the state for the preparation of an index to its Code, to be used in the publisher's own and in the state publications, and for which the state was to pay less than the actual cost of production, was an independent contractor, not an employee, so far as concerned the proprietorship of the copyright of the index.

**19. Copyrights ⊙83—State and publisher could be assumed not to have intended that publisher should surrender below cost copyright to index used for own and state publications.**

The state and a publisher, who, as an independent contractor, contracted to prepare an index to the state Code, to be used in his own and in the state publications, may be assumed not to have intended that the publisher should surrender his copyright for a sum less than the cost of the work.

**20. Copyrights ⊙83—Proprietor's permitting state to publish Code index under promise to acknowledge proprietor, and failure to assert rights for breach, did not show intent to abandon copyright.**

Permitting publication by the state of an index to its Code under the state's promise, made through the Attorney General and within his apparent statutory powers, to acknowledge the proprietor as the source of material, and failure to assert rights against the state, because of publication without the promised notice, did not show intent to abandon the copyright.

**21. Copyrights ⊙75—Proprietor's delay in asserting rights against third person will not avail otherwise infringing defendant.**

A proprietor's delay in asserting rights arising from a third person's unauthorized publication of copyrighted matter will not, in the circumstances, avail an otherwise infringing defendant.

**22. Copyrights ⊙29—Accidental omission of copyright notice from volume is unimportant, where work was admittedly copyrighted.**

Accidental omission of copyright notice from the particular volume of a work used by an alleged infringer is unimportant on the question of infringement, where the work was and is admitted in the pleadings to have been copyrighted.

**23. Copyrights ⊙56—Use, as source material, in annotating statutes, of tables of cases in copyrighted digest, does not constitute infringement; use being noncompetitive.**

Use, as source material, in annotating statutes, of the tables contained in a copyrighted digest showing cases digested, judicially noted, affirmed, and reversed, does not constitute infringement, in view of the dissimilarity and lack of competition between such tables in a digest and an annotated Code.

**24. Copyrights ⊙56—Determining protection to be afforded proprietor of copyrighted statute book against appropriation of results of mechanical work in finding and arranging cases is problem of reconciling his claims with public interest.**

The problem of determining the degree of protection to be afforded the proprietor of a copyrighted edition of statutes against appropriation of the results of his mechanical work in finding, selecting, and arranging the reported cases, is one of reconciling the proprietor's claims with the public interest in having subsequent workers in the field allowed to make use of accumulated knowledge, especially of sources.

**25. Copyrights ⊙55—Text-book, as unique result of independent intellectual labor, differs fundamentally, within law of copyright, from compilation capable of independent substantial duplication.**

A text-book, as a product of intellectual labor and literary skill of such nature that results are unique whenever the same materials are dealt with independently, and which ordinarily contains critical discussion of earlier writers, differs fundamentally, within the law of copyright, from a compilation such as a directory or list, which may be substantially duplicated independently, and is intended, not as a contribution to knowledge, but as a guide to other workers in the field.

**26. Copyrights ⬤=56—Greater latitude is expected in relation to infringement as to authors consulting text-books than as to compiler using similar compilation.**

In determining questions of copyright infringement, greater latitude is to be expected as to authors consulting other text-books, directories, or lists than as to one compiler using another similar compilation.

**27. Copyrights ⬤=56—Statute annotator's use of competitor's citations prior to independent gathering of authorities may constitute infringement, though cases are subsequently examined.**

Use, by the annotator of statutes, of the citations of cases in a copyrighted competing publication, prior to independent gathering of authorities, may constitute infringement, even though the cases cited are subsequently examined; such use being different from consultation of the competing work for purposes of discovering discrepancies and omissions, after examination of all the original sources.

**28. Copyrights ⬤=56—Statute annotator's use of citations in competing work for "checking up" incomplete work must be distinguished from consultation subsequent to examination of all original sources.**

Use by the annotator of statutes of citations of cases in a copyrighted competing publication, for the purpose of "checking up" original work, obviously so incomplete that comparison must result in much appropriation, must be distinguished, in determining questions of infringement, from consultation subsequent to examination of all the original sources.

**29. Copyrights ⬤=56—Taking and using citations of cases from annotated statutes held to constitute infringement, even if text of annotations was not copied.**

Use by annotator of statutes of a copyrighted competing publication in obtaining much material for a third of the time, by taking citations of cases therefrom and using them in annotations, *held* to constitute infringement, even if the text of the annotations was not copied.

**30. Copyrights ⬤=86—Opportunity would be given to prove noninfringement as to parts of work, to procure exemption from injunction.**

Opportunity would be given to the compiler of an annotated statute book to prove noninfringement in respect to some parts thereof, in order to procure exemption of those parts from an injunction granted because of infringement established as to portions of the work.

Appeal from the District Court of the United States for the Northern District of Ohio; Paul Jones, Judge.

Suit by the W. H. Anderson Company against the Baldwin Law Publishing Company. The testimony taken in court and exhibits were referred to a special master, to ascertain and report his findings of fact and conclusions of law. The master filed a report, recommending that the bill be dismissed, to which the plaintiff filed exceptions. From a decree overruling the exceptions, and confirming the master's report, the plaintiff appeals. Reversed.

Murray Seasongood, of Cincinnati, Ohio (Robert P. Goldman, of Cincinnati, Ohio, on the brief), for appellant.

Newton D. Baker, of Cleveland, Ohio, for appellee.

Before DENISON, MACK, and MOORMAN, Circuit Judges.

MACK, Circuit Judge. Injunction, surrender of plates, accounting of profits, and damages for infringement of copyrights were sought by and denied to plaintiff, appellant. Defendant's one-volume work, Throckmorton's Code of Ohio, published in 1921, with appendix thereto of 1923, is alleged to be an infringement of plaintiff's copyrights of Page & Adams' seven-volume Annotated General Code (1912) and four-volume supplement (1916), of the Topical Index to the official General Code (1910), of the unannotated first three of the four-volume Page & Adams Compact Code (1920), and of volumes 9 and 10 of Page's Ohio Digest (1915).

Infringement is charged in three respects: (1) The copying or paraphrasing of annotations and indices; (2) the use of plaintiff's analyses of cases and grouping of material; and (3) the taking of citations and/or duplicate citations from plaintiff's books, with or without checking them up, either as a substitute for or as a supplement to an independent survey of the sources. As to the first two methods of infringement, while the facts are denied, the conclusion of infringement as a matter of law is conceded, if the facts be established as alleged. In respect to the third, there is disagreement as to the legal conclusion to be drawn from the facts, but a partial agreement as to the facts themselves.

After three weeks of trial in court, at the suggestion of the District Judge and with the consent of the parties, the matter was referred to a special master, to ascertain and report his findings of fact and conclusions of law. Under this reference, he properly heard no witnesses, and based his report on the testimony taken in court and on his examination of the voluminous exhibits prepared by each party, and themselves largely based upon the volumes alleged to be infringed upon and infringing. Plaintiff listed over 150 examples of alleged similarities or identities in expression, content, omissions, and mistakes occurring in the works of

the two parties; many additional examples have been pointed out in briefs and arguments on this appeal. The special master was not directed to determine the question of damages; the court had declined to consider evidence thereon until the question of infringement had been determined, a course to which counsel agreed. The matter of damages was to come up for later consideration by the court, in case it should become material.

The master reported that there had been a use of citations in plaintiff's annotations to the Code, but merely to check up the results of defendant's own researches; this, in his judgment, did not constitute infringement. As to the "Topical Index," he reported that plaintiff had no copyright therein. He further found no infringement in the taking of duplicate citations and case histories from Page's Ohio Digest. Identities between the defendant's index and the index of the 1916 Supplement, the copyright in which is conceded, he ascribed to legitimate copying from state pamphlets which had reproduced this index material. While he found instances of direct copying from plaintiff's annotations, they were not sufficient in number or importance, relatively to the entire work, to justify, in his judgment, either an injunction or damages. He recommended, therefore, that the bill be dismissed. The District Judge overruled plaintiff's exceptions and confirmed the master's report.

Plaintiff relies upon both direct and circumstantial proof of infringement. Of the former there are two kinds: The testimony of operatives at the printing plant where "Throckmorton's Code" was originally published, and the cross-examination of Baldwin, defendant's president, Throckmorton, the editor of its volume, and the latter's legal assistants. The circumstantial evidence consists of the examples of similarity and identity.

In 1923, defendant herein sued the Breitenbach Linotyping Company, its printer, in the Southern District of Ohio for infringement of the alleged copyright of "Throckmorton's Code." The defense was invalidity, in that the Code itself infringed the present plaintiff's copyrights. After testimony on both sides, a settlement was made at the suggestion of the trial judge; his informal views against the present defendant were, therefore, not embodied in a formal opinion.

At the present trial, four employees of the Breitenbach Company repeated their former testimony that about 25 per cent. of the copy for the Throckmorton Code, upon which they had worked, consisted of clippings set up in the distinctive type of the Page & Adams volumes. Nine of the defendant's editors, practically the whole staff, categorically denied that any clippings from Page & Adams were ever pasted upon the cards sent to the printer. The only clippings, they said, were from the 1890 Smith & Benedict Annotated Statutes, the copyright of which, owned by plaintiff, was in force when defendant began its preparation for, but expired before it had printed, the alleged infringing Code. Liberal use of Smith & Benedict is not only conceded, but asserted by defendant.

Several lines of attack upon the Breitenbach witnesses are pursued. Two of these witnesses, sisters of Breitenbach, are charged with bias; four, who declared that sometimes the card came to the printer with more than one clipped annotation to the card, are contradicted by Throckmorton and Baldwin, who testify that it was the invariable policy to have a separate card for each annotation. Baldwin, however, admitted a departure from this invariable policy in one of his other publications. The cards were not produced. Plaintiff's witnesses testified that they had been returned to defendant; this defendant denied. A great mass of evidence as to the dealings between the parties and the custom of the printing trade was introduced on this point. It is not conclusive either way. The special master found a slight preponderance in favor of the defendant.

On the entire evidence in relation to the Breitenbach controversy, as it affects the present case, we are of the opinion that it cannot be deemed of any considerable weight, much less decisive, for either side.

On behalf of defendant, Baldwin testified that he had spent a good part of his time between 1917 and 1920 in preparing a "plant." He described his method as follows: First, he took a 4x6 card for every subsection of the Ohio Code as amended to date, and pasted upon each card the appropriate clipping from the official statutes. Then he began to clip from Smith & Benedict (before Page & Adams, the standard Annotated Statutes) all annotations and cross-references which were still timely, pasting them on cards to be filed with the proper Code section card. He admitted the use under oral license of a copyrighted volume of Ohio Annotated Statutes published by Bobbs-Merrill Company. Finally he testified that he went through the Ohio Supreme Court reports which postdated the publication of Smith & Benedict, inspecting the "tables of

statutes construed" and jotting down on his cards each reference there found.

In 1920, witness Throckmorton, a professor of law at a prominent Ohio university law school, and a stockholder of defendant, was engaged to complete the work. He associated with himself one faculty colleague and a number of students and recent graduates of high academic standing; later he received the assistance of the dean of the school. There is much in the record attesting to the high reputation of the members of this editorial staff. All the editors, it is testified, were warned of the dangers of copyright infringement through improper use of Page & Adams, and were thoroughly familiar with Throckmorton's views of copyright law.

According to Baldwin, his part of the annotations was very meager. In the Breitenbach Case, as he conceded, he had put it at possibly 10 per cent. It is significant that in the testimony in the Breitenbach Case as to the preparation of defendant's volume, there is no mention of the use of the Bobbs-Merrill volume or of the Ohio state reports.

Prof. Throckmorton described his method as follows: Any annotations in the "plant" as it came to him, which seemed satisfactory, were left undisturbed. This, however, was not frequent. If a note was unsatisfactory in form or content, the editors were instructed to refer to the original case and syllabus, and then to rewrite it. Only after this had been done for all the material turned over to them, were the editors to examine Page & Adams, both the original Code and Supplement, to see what cases were there cited that were not in the "plant." With a list of such cases, they were again to examine the reports and write up original notes. Most of the editors testified that they followed the prescribed method. But one admitted that at times he read through the annotations in Page & Adams, not merely to get the list of cases, but to see what Page said of any of them which he had failed to understand. The work of this annotator was found by the special master to have been one of the three portions of defendant's publication in which most of the inexplicably close parallelisms with Page & Adams appear. The two annotators of the other portions alluded to did not testify.

It was further testified that, after about one-third of the work had gone on in this way, a change was made; but no satisfactory reason therefor is offered. The staff was ordered to stop using Page & Adams' citations. Prof. Throckmorton testified that thereafter he checked up the admittedly incomplete list of citations in the "plant" with the Bobbs-Merrill volume, originally a publication of the American Publishing Company. But the staff was still permitted to keep Page & Adams open before them, for the purpose, it is said, of consulting, not the annotations, but solely the text of the statutes. This text included such changes in the Code of 1910 as were made by the Session Laws, volumes 101 and 102. Some of the annotations well toward the end of defendant's volume were admitted, however, upon cross-examination, to have been prepared under the old system. According to the testimony of Page and his assistants, on the one hand, and Throckmorton and his assistants, on the other, the time required by the former for plaintiff's work was at least four times that needed by the latter for 90 per cent. of defendant's work brought down to a later date. Defendant explains this great difference to be due to greater efficiency of defendant's staff and the proper use by them of the earlier works.

[1, 2] Comparison of the Page & Adams publication with that of Throckmorton is made difficult by their marked differences in style, size, and scope. Plaintiff's edition, original and supplemental, of the Code, consists of 11 volumes with lines running the full width of the page; defendant's is a one-volume work, containing some 3,000 double-column pages, with a supplement thereto. The former aims at completeness of statement; the latter at extreme brevity. This justifies giving more than ordinary emphasis to such similarities as do appear. On the other hand, a certain similarity of outline and subject-matter is inevitable, in view of the character of the books and of their common basis in the work of earlier annotators.

A careful comparison of the two works establishes, in our judgment, a substantial and improper appropriation by defendant of the labor which went into the plaintiff's volumes. We find clear proof of methods which go further than defendant's witnesses have admitted; their own testimony, however, suffices to make out a case for the plaintiff.

[3-6] As to the weight which should be accorded to the special master's findings, it is to be noted that he did not hear the witnesses. Our examination of the evidence upon which he acted has led us to the conclusion that it fails to sustain his findings. We have the less hesitation in reaching this conclusion, inasmuch as the special master evidently con-

sidered the case in the light of two basic assumptions, in which we do not concur. The first is that the high professional standing of the persons connected with defendant's publication makes it almost impossible for them to have done anything which amounts in law to infringement; the second, that no identity of language, similarity of idea, or even duplication of mistakes, has much significance, if the defendant, in explanation, can but refer to any line in the Ohio statutes, decisions, syllabi, or legal texts other than Page & Adams, from which its material might have been obtained; further, that many such instances of suspicious, but inexplicable, similarities do not have a cumulative effect. Cf. West Publishing Co. v. Lawyer's Co-op. Pub. Co., 79 F. 756, 761, 35 L. R. A. 400 (C. C. A. 2d, 1897).

[7] One of the most significant evidences of infringement, the Supreme Court has said, is the identity of errors. Callaghan v. Myers, 128 U. S. 617, 662, 9 S. Ct. 177, 32 L. Ed. 547 (1888). In List Pub. Co. v. Keller (C. C.) 30 F. 772 (1887), an injunction was granted on the basis of 39 common misprints and mistakes in a list of some 3,-000 names, despite depositions of the defendant attempting innocent explanations of the identity. See, too, Jeweler's Circular Publishing Co. v. Keystone Publishing Co., 281 F. 83, 94, 26 A. L. R. 571 (C. C. A. 2d, 1922).

[8] Plaintiff produced before the master 26 examples of alleged common errors. Of these, 7 either could not be accounted for by the master in any other reasonable way than as copies, or were admitted by him to be highly suggestive thereof. In our judgment at least 8 more of these 26, viewed without the master's preconceptions, also clearly indicate copying. On this appeal, plaintiff has pointed out in the record 79 similar examples, many of which leave with us the same impression.

[9] Plaintiff lists 54 asserted instances of paraphrasing or identities of expression. Fifteen of them are considered by the master clearly to show or to suggest the use of Page & Adams' corresponding notes, in some instances amounting to verbatim copying of long annotations. Quite a few other instances among the 54 seem to us highly suggestive; for example, a 50-page decision, with 2½ pages of syllabi, is abstracted by Page in a 5-line note. Throckmorton devotes 2½ lines to the case, practically restating the first half of the earlier note. True, the last page of the opinion contains language from which both notes could have been

independently derived. In another instance, both Page and Throckmorton print a long note, identical with the syllabus and the Smith & Benedict annotation, save that, in both plaintiff's and defendant's annotations, the same two words are changed from the original. This change, while proper enough, was by no means a necessary, or the only possible, one. Numerous other examples of alleged paraphrasing have been pointed out by plaintiff in the argument and briefs on this appeal; a number of them are not explained away to our satisfaction. In view of the great improbability of two workers finding the same needle in a wordy haystack, as well as other equally striking coincidences and some unmistakable improprieties, we conclude that defendant's annotator at the very least derived considerable assistance from the mental labors of his rival.

[10, 11] Some comparative tables have been introduced by the plaintiff to show that, in very long annotations, the analysis of the subject and the subheadings have been taken over from Page & Adams. This evidence is only fairly convincing, especially since the examples are not sufficiently numerous to support a generalization. So, too, it does not seem very important that the two books number chapters and sections of the Ohio Code in the same way, since most of the numbers are official, and the rest part of a conventional scheme. But there is one instance of an identical chapter heading thoroughly out of line with the defendant's usual scheme, which clearly shows copying.

[12] An avoidance of independent work, such as justifies an inference that material which could easily be copied was in fact taken from Page & Adams is shown in Throckmorton's treatment of statutory sections like the one on Banks and Banking. This was codified in 1919 and so after the Page & Adams Supplement. It is unannotated in Throckmorton; the available material in Page & Adams under the old sections on this subject would have had to be completely redistributed, or the original sources would have had to be studied, if these revised statutory provisions were to be annotated properly. Evidently this was too laborious an undertaking, unless Throckmorton's explanation, borne out in some, but not in all, cases, be accepted, namely, that it was not his editorial policy to annotate new sections with cases decided under the old laws.

[13, 14] Finally, there are some very significant repetitions in Throckmorton of Page & Adams peculiarities of citation. For ex-

ample, the report cited everywhere in Ohio as "O. S. S. C.," is cited as "O. S. U." in Page & Adams, and in an obsolete volume which Throckmorton could not possibly have been using. Defendant cited it as "O. S. U." So, too, though Throckmorton had no occasion to give the duplicate citations from the Ohio Law Bulletin, a practice followed by Page for advertising purposes at a date when the Bulletin citations were timely, he, nevertheless did so a number of times; some occur in annotations otherwise suspicious.

[15, 16] To summarize our conclusions in the light of the testimony of the defendant's witnesses, the admissions of defendant's counsel in the course of attempts to explain away the exhibits, the conflicts in the evidence, and a comparison of the publications —we are satisfied: First, that there was clearly some outright copying and paraphrasing of the plaintiff's annotations and other original material; enough to make it probable that very many similarities in the volume are due to this cause, even though a number of them are capable of an innocent explanation. Second, that Throckmorton's original system and the temptations inherent in his later one, prompted defendant's annotators to peruse Page's annotations and appropriate ideas therefrom, both in the way of literary expression and of designation of the point of the case. Third, that there was a great deal of copying from the old Page & Adams index, the validity of the copyright to which is challenged by defendant, and from the copyrighted index to the Page & Adams supplement, or at least from government pamphlets which had reprinted from these indices without express permission of plaintiff. Fourth, that cumulative references and case histories were freely taken from the alphabetical table of Ohio decisions in volumes 9 and 10 of Page's Ohio Digest. Fifth, that the defendant's staff obtained from Page & Adams a substantial part of their cases by way of "checking up" on glaringly incomplete lists, and that, even if these cases were subsequently read and independently abstracted, the labor of finding all Ohio cases construing statutes and deciding under what section of the Code to deal with them was thus saved to defendant.

The first two propositions are established, in our judgment, by the evidence as hereinabove recited; the question of substantial infringement is thereby concluded in favor of plaintiff.

We come to the third proposition. The evidence is that defendant, while not copying directly from plaintiff's indices to the Page & Adams Code of 1912 and to the Page & Adams Supplement of 1916, did make liberal use of state pamphlets which had reprinted substantial portions thereof without plaintiff's authority. Defendant does not dispute that one who copies from an infringer is himself guilty of infringement; but it denies both that plaintiff had a valid copyright to the 1912 index and that plaintiff is in a position to protest against the republication of either index by the state or against the use of the state pamphlets.

In April, 1906, the General Assembly passed an act authorizing commissioners to revise the statutes and to provide an index thereto. In 1910 the revision, without index, was adopted by the Legislature under the name of "The General Code." It was provided that, each time an edition of the Code was published, the Attorney General should procure a copyright thereon. A separate, later, statute directed the Attorney General to prepare an index for each edition of the Code. Shortly before the enactment of these statutes and the Code, a committee of the Legislature made a contract with plaintiff, which was then engaged in the preparation of its Annotated Code, pursuant to which plaintiff prepared an index suitable for both its own and the state publications. The consideration was $1,500, the bare cost of clerical work and out of pocket expenses, with nothing for overhead or profit. After the passage of the statutes, the Attorney General orally agreed that the copyright of the index contracted for should remain in plaintiff.

[17-20] On these facts, the copyright granted to plaintiff on the index is valid. An author is not necessarily precluded from copyrighting a work produced under contract with another person; the intent of the parties as to which of them shall have the right to copyright is decisive. Where a contract of employment is silent, there may be an implication in favor of the employer. But in the present case plaintiff was an independent contractor, rather than an employee; moreover, it may properly be inferred that the parties did not intend plaintiff to surrender a copyright in consideration of a sum less than the bare cost of the work. But, in any event, it would seem that by the above-mentioned statutes the Attorney General was impliedly authorized to modify contracts for indexing. There is nothing in the statutes which reserves the copyright on the index to the state; the statute concerning a copyright on the Code makes no reference to the then nonexistent index, while the subsequent stat-

ute providing for an index has no provision for a copyright thereof.

[21] Defendant further contends that plaintiff cannot in any event complain of infringement as to either of the two indices, because the publication by the state was known to its vice president and was not objected to. With this we cannot agree. The officer admits knowledge in the case of only a few of the dozen pamphlets in question. He testifies that, before publishing them, the state promised to acknowledge plaintiff as the source of the material, and that, when the pamphlets appeared without such notice, he thought that there were legal obstacles and practical objections to a suit against the state. There is no evidence of an intent to abandon the copyright. A delay in asserting rights, which might be fatal in a suit against an innocent party who had been deceived thereby, will not avail an otherwise infringing defendant.

[22, 23] As to the fourth proposition: The special master found as an uncontroverted fact that defendant had obtained cumulative citations and histories of the affirmances and reversals of cases, without checking back to the original reports, from the tables of cases digested and of cases judicially noted, affirmed, and reversed, in volumes 9 and 10 of Page's Ohio Digest. It is unimportant that a copyright notice was accidentally omitted in the printing of the copy of volume 10 which defendant used, since there is no doubt that the work was in fact copyrighted, and defendant's pleadings so admit. However, we agree with the special master that, in view of the dissimilarity and lack of competition between such tables in a Digest and an Annotated Code, the use of this portion of the Digest for annotation purposes did not constitute infringement. It gave defendant only source material; the labor of abstracting the cases and distributing them to the proper Code sections had to be performed. In our judgment, such a use of source material is not to be denied for noncompetitive work.

[24] The fifth proposition raises important questions of law. Plaintiff claims protection against the appropriation of the result, both of his mechanical work in paging through the volumes of Ohio reports to find the relevant cases and of his mental labor in deciding which cases to select and under what section of the Code to use them. On the other hand, there is the public interest in having subsequent workers in a field allowed to make use of the accumulated knowledge of the past, especially knowledge of the sources.

The problem of reconciling these opposing claims has been before the courts many times, often, especially in the second circuit, in cases involving law books.

[25, 26] In considering the authorities, it is necessary to bear certain distinctions in mind. A text-book differs fundamentally from a compilation, such as a directory or list. The latter simply sets forth names, symbols, or the like; its only usefulness lies in its presentation of facts which any one might have learned by repeating the compiler's industry, and which, having learned, he could present to the public practically in only the one way. The former is the product of intellectual labor and literary skill, results of which are unique each time the subject is handled independently, even though the same materials are dealt with. Moreover, in a text-book there is ordinarily a critical discussion of earlier writers and a re-examination of their sources. Again, the directory or list is intended to be used as a guide to something further and different; it is not itself a contribution to knowledge, which is to be availed of by co-workers in the same field. For all these reasons, greater latitude is to be expected in the case of authors consulting other text-books or using directories and lists than in the case of one compiler attempting to make use of another similar compilation. Law treatises and legal encyclopedias are in the class of text-books. A list of cases or case histories is in the directory class. Midway between the two groups stands the law digest, with its list of abstracted cases.

[27, 28] Another important distinction concerns the use to which the rival's citations are put. When the earlier volume is consulted at the start, before the defendant has done any independent gathering of authorities, even if the citations are subsequently looked up, the defendant cannot be said to have done more than verified the plaintiff's work; he has done nothing afresh. On the other hand, a different situation is presented if the competing work is consulted only after the defendant has himself examined all the original sources, and for the sole purpose of discovering possible discrepancies or omissions, which, when found, will be investigated and corrected by further independent work. A very different practice from this last is the "checking up" of obviously incomplete original work, so incomplete that the defendant must know the process of comparison will result in his taking over a large amount of matter from his rival.

We turn now to the cases. In England the problem was opened up by Kelly v. Mor-

ris, L. R. 1 Eq. 697, 702 (1866). Wood, V. C., was of the opinion that any use whatsoever of earlier competing works by the compiler of a directory constituted an infringement. Later, as Lord Chancellor Hatherly, he held in Pike v. Nicholas, L. R. 5 Ch. 251 (1870), that one writer of an historical essay might properly go to another historian's work to find sources. These two cases, taken together, demonstrate just the distinction we have pointed out in the preceding paragraph. But this is overlooked in England, where Kelly v. Morris is considered as a much-shaken authority. See Morris v. Wright, L. R. 5 Ch. 279 (1870).

Banks v. McDivitt, Fed. Cas. No. '961 (1875), is the earliest American decision. The parties, as in the instant case, had each published an annotated statute book. Verification by defendant of copied citations afforded no defense. An injunction issued.

West Publishing Co. v. Lawyers' Co-op. Publishing Co., 79 F. 756, 35 L. R. A. 400 (2d C. C. A. 1897) involved two digests. The editors of the defendant were found, not only to have taken citations, but also to have read the plaintiff's syllabi to aid their examination of the cases. Exhibits of common errors and of the speed with which the editing was completed were held to outweigh the explicit sworn denials of the members of the editorial staff. The court, in upholding the injunction, said that there may be infringement through labor-saving use of a rival's winnowing of the material, even though there is no close identity in the finished products. The defendant, having put temptation in its editors' way by supplying them with plaintiff's publications of reports containing the copyrighted syllabi subsequently incorporated in the digest, so that they might use the uncopyrighted opinions, was held liable for the foreseeable further improper use of the syllabi themselves.

In Edward Thompson Co. v. American Law Book Co., 122 F. 922 (2d C. C. A. 1903), one encyclopedia was alleged to be an infringement of another. The defendant's workers never saw the earlier book, but, when starting on their task, each man had been supplied with a list of cases, some of which had been taken from the plaintiff's encyclopedia. An injunction was denied, upon considerations of public policy and the nature of treatises, to which we have already adverted, and also on the ground of the plaintiff's unclean hands. The court's whole discussion was in terms of authors and books; it specifically distinguished the case of a compilation of quotations.

George T. Bisel Co. v. Welsh (C. C.) 131 F. 564 (1904), resembles the Banks Case. Here the copying of plaintiff's collection of statutes, as proven by comparison of errors and peculiarities despite defendant's editors' sworn denials, was the basis for an injunction.

A strong case is Sampson & Murdock Co. v. Seaver-Radford Co., 140 F. 539 (1st C. C. A. 1905). The defendant, in compiling his directory, had first made an expensive independent canvass. Next he checked up with the plaintiff's directory for omitted names, which his canvassers then verified. However, what the plaintiff said about the names was copied upon slips, and these slips were used in the verification. The process was responsible for 12 per cent. of the defendant's names. As in the instant case, the two publications were for substantially, but not identically, the same purpose. An injunction was granted; the distinctions between lists and texts above stated was the basis of this decision.

Hartford Printing Co. v. Hartford Directory & Publishing Co. (C. C.) 146 F. 332 (1906), contains a strong dictum by Platt, District Judge, that, if the compiler of a list starts with a really thorough original search, he may later resort to a rival list for further names to be investigated. We express no opinion on the soundness of this distinction. The facts before us show an obviously incomplete, even colorable, preliminary search.

In West Publishing Co. v. Edward Thompson Co., 176 F. 833 (2d C. C. A. 1910), an encyclopedia copying syllabi in a digest was held an infringement. But if the defendant had merely taken lists of cases from the plaintiff for a starting point, said the court, a different result would have been reached. However, the point of this dictum seems to be merely that the use of the cases in a digest is proper in compiling a textbook. On the other hand, as is recognized, "obviously it would not be fair for any publisher of reports of the same cases or of digests of them to copy lists of cases * * * whether by so doing he merely saved mechanical labor or literary work."

Shepard v. Taylor, 193 F. 991 (2d C. C. A. 1912), is a case of proved copying, apparently without checking up. All that was copied, though, was the names of cases; the rival works being citators. Clearly one cannot go to a rival work for a mere list of cases, even if these are then checked up.

Finally, is the significant case of Jewelers' Circular Publishing Co. v. Keystone Pub-

lishing Co., 281 F. 83, 26 A. L. R. 571 (2d C. C. A. 1922) affirming (D. C.) 274 F. 932 (1921). The plaintiff put out a list of firm names and trade-marks. Defendant took this information, went to the firms to check it up, and then reprinted it. This was considered by a majority of the court to suffice for an injunction, though the facts presented stronger alternative grounds of decision. Defendant had not done the preliminary work of selecting, it was pointed out, and in this connection the majority approved the decision in List Publishing Co. v. Keller (C. C.) 30 F. 772 (1887), that "if the defendant has used the list to save himself the trouble of making an independent selection or classification of the persons whose names appear in the Social Register, although he may have done so only to a very limited extent, he has infringed the complainant's copyright."

[29] We conclude that, even if defendant had not gone beyond what its president and editor admitted to. have been its system of operations for at least a third of the time, namely, to depend for much of its material upon the taking of citations of cases from plaintiff's volumes, to be verified and then used in its annotations, but without copying plaintiff's text, it has infringed plaintiff's copyright.

The decree must be reversed for further proceedings in accordance with this opinion. [30] As to the injunction, if, in the light of the views herein expressed, defendant desires that some parts of its work be exempted therefrom, opportunity may be given clearly to prove noninfringement in respect to such parts.

Decree reversed.