## SAUER v. DETROIT TIMES CO.

(District Court, E. D. Michigan, S. D. September 4, 1917.)

No. 165.

1. COPYRIGHTS ☞83—ACTIONS FOR INFRINGEMENT—EVIDENCE.

In an action for infringement of complainant's copyright on a map, evidence *held* insufficient to show that defendant's representative was by complainant's partner granted permission to use the copyrighted map.

2. COPYRIGHTS ☞48—LICENSE TO USE—PERMISSION TO REPRODUCE.

That the owner of a copyright allowed a firm of which he was a member to dispose of the copyrighted publication does not, the copyright not having been assigned to the firm, authorize one of the partners to license another to reproduce the copyrighted publication.

3. COPYRIGHTS ☞50—SUBSEQUENT COPYRIGHTS—SCOPE.

Where complainant, after copyrighting in 1915 a map for a city, prepared a new map in 1916, showing added subdivisions, and copyrighted the same, the latter map was entirely distinct from the first, and the fact that defendant had previously obtained permission to reproduce in its newspaper the 1915 map does not, after the preparation of the 1916 map, authorize it to reproduce that one for the purpose of advertising the new subdivisions; this being so, even though additions to the 1915 map were in respect to size relatively small.

4. COPYRIGHTS ☞83—ACTIONS FOR INFRINGEMENT—EVIDENCE.

In an action for infringement of a copyrighted map, evidence *held* insufficient to show that complainant, by consenting to defendant's publication of an earlier map, consented to defendant's publication of the map involved.

5. COPYRIGHTS ☞87—DAMAGES—AMOUNT.

Under Copyright Law (Act March 4, 1909, c. 320) § 25, 35 Stat. 1081 (Comp. St. 1916, § 9546), declaring that, if any person shall infringe a copyright in any way protected under the copyright laws, such person shall be liable to pay to the copyright proprietor such damages as he may have suffered, or in lieu of actual damages such damages as to the court shall appear to be just, and that in assessing such damages the court may in its discretion allow, in the case of a newspaper reproduction of a copyrighted photograph, damages not more than $200 nor less than $50, and in other cases damages not exceeding $5,000 nor less than $250, which damages shall not be regarded as a penalty, the owner of a copyrighted map, which was reproduced in a newspaper without permission, may, without showing any actual damages, recover at least the minimum

amount of $250 despite the contention that it would amount to the infliction of a fine, the statute expressly declaring such damages shall not be regarded as a penalty.

6. COPYRIGHTS ☞87—INFRINGEMENT—DAMAGES—AMOUNT.

Under such statute, though the defendant newspaper published the map in both its regular edition and a special noon edition, yet as it acted in good faith, under the assumption that it had permission, and surrendered infringing plates as soon as its attention was called to the matter, the holder of the copyright is not entitled to recover damages on the basis of two acts of infringement, for, as the statute declares that, if any person shall infringe the copyright in any work protected by the copyright laws of the United States, he shall be liable to such damages as to the court shall appear just, the court may treat the several publications as one infringement.

In Equity. Bill by William Sauer against the Detroit Times Company. Decree for complainant.

C. R. Stickney, of Detroit, Mich., for plaintiff.
William Lucking, of Detroit, Mich., for defendant.

TUTTLE, District Judge. This is a bill alleging infringement of a copyright and containing the usual prayer for an injunction and damages. The questions involved are those of infringement and damages.

Plaintiff, William Sauer, is the owner of two copyrights on maps of the city of Detroit, one published and copyrighted in the year 1915, and the other in 1916. He and his brother, Joseph, are engaged, as partners under the name Sauer Bros., in publishing and selling these and other maps in said city of Detroit.

Defendant is engaged in publishing a daily newspaper in Detroit. On August 28, 1915, the defendant by its advertising manager obtained permission from the plaintiff to publish in its newspaper the former of the maps already mentioned, which had been on the market for several months, and many thousand copies of which had been already sold by the plaintiff. The defendant desired to publish this map in conjunction with certain real estate advertisements of subdivisions in the city, and it was for that purpose that it obtained this permission to publish such map. The plaintiff also at that time, at the request of defendant, drew a map of a certain portion of the city not contained in the printed map, and this was added to the latter map when published by the defendant.

[1] In the latter part of March, 1916, defendant again desired to publish a map of the plaintiff in connection with its advertising, and especially with respect to certain new subdivisions covering a different district of the city than that featured in its publication of the map of the previous year. Accordingly, the same representative of the defendant, Mr. McKeown, went to the place of business of the plaintiff, as he claims, for the purpose of requesting plaintiff to draw for him, as he had done the previous year, an addition to the map showing these new subdivisions. Plaintiff was not there when Mr. McKeown arrived, and the latter had his interview with the former's brother, Joseph. There is practically no dispute as to what occurred at this interview. On the cross-examination of Joseph Sauer, he testified as follows:

"Q. When you came into the place of business of the Wolverine News Company and found Mr. McKeown there, what conversation took place exactly? A. He explained to me he knew my brother and mentioned that my brother had loaned him a map previous to that time. Q. Did he tell you what for? A. For publishing in the paper. •And he asked to see one of our latest—the latest copy of our map, explaining to me he wished to buy it. On finding he only wanted to purchase one map, I referred him to Mr. Groscup, who, I think, sold him a map. * * * Q. He told you. you say, that he wanted to buy the latest map? A. Yes, sir. Q. He first explained he had. used one before for publication purposes, and had dealt with your brother in that regard, did he? A. Yes, sir. * * * Q. Did Mr. McKeown tell you what he wanted that map for? A. He did not. Q. Did he describe what kind of a map he wanted —-what section? A. He did not."

Mr. McKeown testified as follows:

"Q. Explain briefly what took place. A. I got hold of the Wolverine News Company and asked for Mr. Sauer. As far as I knew at that time, there was but one Mr. Sauer. I went down to the Wolverine News Company and asked for Mr. Sauer, and this other Mr. Sauer came out— Q. You mean Mr. Joseph Sauer? A. Yes, sir; and I told him, 'You are not the Mr. Sauer I talked with previously;' and he told me he was his brother. That was the first intimation I knew he had a brother. Q. What took place, briefly? A. I told how Mr. Sauer had been kind enough to allow the use of one of his maps before, and how he told me that he would be glad to serve me at any time, and I told him I was looking for a map of the North Woodward avenue district to be published later on; and Mr. Sauer said, 'You probably want one of our maps just coming out; we can take care of you.' As I remember, Mr. Joseph Sauer then went out, and I bought a map of this gentleman that was in the Wolverine News Company."

The only dispute as to what occurred at this interview was as to whether McKeown explained the exact purpose for which he wished to use this map. This, however, it seems to me, is immaterial, as in any event there can be no doubt that the defendant did not then receive permission to publish in its paper this 1916 map thus purchased by its representative.

[2] Nor does it appear that the brother of plaintiff was authorized to grant such permission. It is true that the partnership Sauer Bros., consisting of plaintiff and his brother, were authorized by the plaintiff, as owner of the copyright on these maps, to publish and sell such maps. Neither the copyright, however, nor any rights therein had been assigned by plaintiff to such partnership, but they remained the property of plaintiff. The fact that property covered by a copyright or patent is sold by others than the owner of such patent or copyright under a license from him does not affect his interest therein or his right to relief from the infringement thereof by third persons. Yale Lock Manufacturing Co. v. Sargent, 117 U. S. 536, 6 Sup. Ct. 934, 29 L. Ed. 954; Hanson v. Jaccard Jewelry Co. (C. C.) 32 Fed. 202; Tully v. Triangle Film Corporation (D. C.) 229 Fed. 297.

[3] It is undisputed that this 1916 map differed in some respects from that of the previous year. The defendant admits it "contains a few subdivisions marked on it that Exhibit 6 (the 1915 map) does not contain," but contends that these new subdivisions covered a space on the map of "possibly a square inch" and that, therefore, the two maps should be considered as substantially the same. I am unable to agree with this contention. It seems to me clear that in considering differ-

247 F.—44

ences between maps the substantial character between such differences cannot be tested in terms of inches. It appears that the main purpose in publishing new editions of these city maps was to keep pace with the growing development of the city and adding to the map of the previous year the new subdivisions platted and placed upon the market since the previous year. The object of the defendant in using this new map was to aid in advertising these new subdivisions, and for this purpose the old map would have been inadequate. The very reason for publishing the 1916 map, instead of the earlier one, was the desire to obtain the benefit of the latest map.

[4] The permission thus relied on by defendant as excusing its conduct in publishing the 1916 map was not broad or general enough to cover any map except that furnished at the time. There is no substantial dispute between the parties as to the circumstances surrounding the giving of this permission. The plaintiff testified on this point as follows:

"Q. (by Mr. Stickney). What was the occasion of this first meeting with Mr. McKeown? A. It was in regard to the using of a part of my map in the Detroit Times. Q. Do you remember what copyrighted edition that was, if it was copyrighted? A. Yes, sir. Q. What edition was that? A. 1915. Q. State just what happened between you and Mr. McKeown, in your own words, just as fully as you please. A. Mr. McKeown called at my place of business at the Wolverine News Company, and asked me for the use of the map in the Detroit Times, with an additional part of the lower subdivision in Ecorse which he wanted added, and I let him use that at that time."

The sole reference to this interview by Mr. McKeown was as follows:

"Q. I believe that he has testified that he met you along in August sometime, of 1915, when you asked for a map of the down-river section to publish, to advertise some additions or subdivisions he had, and it was given to you, and you published it. Do you recollect that? A. Yes, sir."

It cannot, in my opinion, be said that there is any evidence that by thus permitting the use of his 1915 map the plaintiff intended to, or did, consent that this other and different map of 1916 could be used in the same manner, and such former permission does not excuse the defendant in its publication of the later map or render such publication the less an infringement thereof. That such publication constituted an infringement of plaintiff's copyright on this 1915 map cannot be denied, and is not disputed by the defendant except in so far as it may be affected by the objections already discussed and the question of the relief to which plaintiff is entitled here.

[5] At the hearing, plaintiff admitted that it was impossible to prove the extent of the actual damages sustained by him from such infringement and elected to recover the damages allowed, in lieu of actual damages, by section 25 of the Copyright Law, the act of March 4, 1909 (chapter 320, 35 Statutes at Large, 1075 [Comp. St. 1916, § 9546]). This section provides, among other things, that:

"If any person shall infringe the copyright in any work protected under the copyright laws of the United States such person shall be liable * * * to pay to the copyright proprietor such damages as the copyright proprietor may have suffered due to the infringement * * * or in lieu of actual damages and profits such damages as to the court shall appear to be just, and in

assessing such damages the court may, in its discretion, allow the amounts as hereinafter stated. But in the case of a newspaper reproduction of a copyrighted photograph such damages shall not exceed the sum of two hundred dollars nor be less than the sum of fifty dollars, and such damages shall in no other case exceed the sum of five thousand dollars nor be less than the sum of two hundred and fifty dollars, and shall not be regarded as a penalty."

It is urged by defendant that this provision does not apply to the present case for the reason that it was not shown that the plaintiff had sustained any damages from this infringement and that the award of the minimum amount apparently required by this section would constitute merely the infliction of a fine against the defendant, which, under the circumstances in this case, it would be inequitable to compel it to pay. In view of the plain language of the section just quoted and the construction thereof by the Circuit Court of Appeals for this circuit in L. A. Westermann Co. v. Dispatch Printing Co., 233 Fed. 609, 147 C. C. A. 417, this contention must be overruled. In the case just cited, the defendant had infringed the copyright of plaintiff upon certain design sketches illustrative of styles in clothing, by publication thereof in its newspaper on different dates. Plaintiff in its bill alleged that it was impossible to show by proof the actual damages suffered, and that he elected to take the alternative damages given by this section of the Copyright Law. The lower court refused to grant the minimum damages fixed by said section. In reversing the decree, the court, speaking by Judge Denison, used the following language:

"By the clause 'in lieu of' it contemplates an election or discretionary choice between actual damages and 'profits on the one side, and, on the other side, an assumed or somewhat arbitrary award of such damages as may be just. Plaintiff claims that the copyright proprietor is entitled to make this election, and to plant his action arbitrarily and absolutely upon one theory or the other; defendant insists that the election or the discretionary choice is to be made by the court upon the trial. The plaintiff here made the election, if he had the power to do so; and on the evidence there can be no doubt that this was not a case for actual damages, as distinguished from those damages which might be fair and just, and that the court, if called upon to act, must make the same election as plaintiff did. Defendant made no profits, so far as the proofs indicated; the plaintiff's damages rested in the injury to his Morehouse contract and in the discouragement of and the tendency to destroy his system of business. To make any accurate proof of actual damages was obviously impossible. This case must therefore be treated, from any point of view, as one calling for the application of the 'in lieu' portion of the statute. The statute says that 'such damages shall' be governed by a maximum and minimum. Whether this phrase, 'such damages,' and the maximum and minimum limitations, apply to the actual damages which may be proved and established under the first part of this section, or only to the 'just' damages given 'in lieu of actual damages,' cannot be determined from mere arrangement of the language, but must depend upon more indirect interpretation. This question likewise does not directly require decision in this case. The limitations unquestionably apply to the 'in lieu' damages, which are the only ones here involved; their application to actual damages may be passed over. * * * We see no escape from the application of the $250 minimum in a case like this. * * * It seems to us the plain meaning of the language that Congress intended that the plaintiff should not recover less than $250 damages in any copyright infringement suit not based upon a newspaper reproduction of a photograph—at least in any case where the actual damages fail to appear so clearly and so fully as to forbid resort to the 'in lieu' clause. The necessary effect of the provision is to prohibit the award of merely nominal damages. This intent implies no undue harshness. Not only does the

typical copyright infringement, if not every one, involve indirect damages almost sure to be considerable, but in few cases would one sum of $250 more than compensate plaintiff for his time, trouble, and expense in detecting, following up, and prosecuting an infringement. It would seem that the words 'shall not be regarded as a penalty' were added out of abundant caution, for under such a situation as usually exists on this subject the awarding of a round sum in damages is no more a penalty, when the damages are liquidated by a court than when they are liquidated by a contract."

This case, in my opinion, controls the present case, and the language just quoted therefrom so completely covers the questions here involved and the contentions made by defendant that no further discussion thereof is necessary.

[6] The only question remaining for consideration is whether damages should be awarded on the basis of one or of two acts of infringement. The infringing acts consisted of the publication of the map in question in the regular edition of the defendant's newspaper on March 31, 1916, and another publication thereof in its noon edition of the following day. It appeared that this second edition was in some respects identical with that of the previous day. A considerably less number of copies thereof were printed, and it contained much of the matter contained in the earlier edition, with a rearrangement thereof, and the addition of some new items and features. It was published in the forenoon of the day following the publication of the previous edition already referred to, which was the regular afternoon edition. Plaintiff contends that, as the defendant published this map in two separate editions, each of which reached a different class of subscribers, it was guilty of two separate acts of infringement and that the damages should be awarded on that basis, at least the minimum amount allowed by the statute being doubled.

Conceding that the publication of this map in each of these editions was a separate act of infringement, it does not follow that these alternative damages are recoverable on that basis. L. A. Westermann Co. v. Dispatch Printing Co., supra. In the case just cited the same contention was made, and overruled by the court in the following language:

"The 'infringement' for which an action will lie is not necessarily the same 'infringement' for which the minimum damages are provided. The same word may have different meanings, even in parts of the same statute, if the context and reasonable construction so require. American Co. v. District of Columbia, 224 U. S. 491, 494, 32 Sup. Ct. 553, 56 L. Ed. 856. The language of the statute is: 'If any person shall infringe the copyright in any work protected under the copyright laws of the United States such person shall be liable * * * to pay * * * the copyright proprietor * * * such damages as to the court shall appear to be just,' etc. What did Congress mean when it referred to the 'infringement' for which not less than $250 must be paid? The common instance, such as Congress probably had in mind, is clear. In case of an unauthorized publication of a copyrighted book, or an infringing edition of a copyrighted song, there are clearly one right and one violation, though an infringing edition may contain many copies. The statute has recognized that in some instances acts of infringement, though connected and united, may require separate treatment, and in other instances (newspaper reproduction of photographs) a number, perhaps a vast number, of acts are treated collectively as one infringement; but in still other instances the statute is wholly silent in these respects. The publishing of an edition of a thousand books is an infringement; so is the putting on sale of one of them. Using

the analogy of the patent law, the manufacture and sale of one article is an infringement sufficient to support an action; yet all the conduct of the defendant in continuing the manufacture and sale over a period of years may be 'the infringement' for which damages will be assessed at the end of the action. There is no corresponding damage statute in the patent law to make the analogy complete; but can it be supposed that the copyright proprietor can take each infringing act out of a series or group, because each one is sufficient to support an action, and then plant a separate action or complaint upon each, and so recover his minimum damages practically as many times as he chooses? These and other considerations convince us that the 'infringement' which calls for minimum damages is that conduct of the defendant, whether being one act or many, which constitutes a connected and fairly unitary invasion of the proprietor's rights. Intermittent newspaper publication forms merely an extreme instance of difficulty in applying this definition. * * * We are satisfied to interpret the statute as saying in effect that in any case where a party shows that a property right and interest protected by the copyright law have been invaded by the defendant, the damages (under the 'in lieu' clause) must not be more or less than the stated amounts, even though the right is composite and the invasion is composite. It will follow that it must be determined by the court as a fact in each case whether one right or more than one has been impaired, and whether the acts of the defendant in taking are to be considered as one infringement or more than one. * * * The defendant newspaper published on several days several items of this group, but these publications were all incidents of one course of conduct; they all occurred within a short time; they ceased as soon as complaint was made. We think it reasonable to say that within the purview of this minimum damage clause they constituted one infringement."

I think that, under all the circumstances, including the fact that the defendant appears to have acted in good faith, and ceased its infringement and surrendered its infringing plates as soon as its attention had been called to the matter, it is equitable to consider, and it should be held, that the acts of the defendant constituted one infringement, for the purpose of computing the damages, and that the plaintiff should recover the minimum amount allowed by the statute for one infringement, namely, $250 and costs; and a decree may be framed along those lines.