## CROCKER et al. v. GENERAL DRAFTING CO., Inc.

District Court, S. D. New York.
April 15, 1943.

Mattuck & Mattuck, of New York City, for plaintiffs.

Ray T. Ernst, of New York City, for defendant.

COXE, District Judge.

This is a suit for alleged infringment of four copyrights covering different editions of an automobile road map prepared by the plaintiffs for use in advertising Howe Caverns, a popular resort in New York State, located about 37 miles west of Albany. The territory shown comprises all of New York, Vermont, New Hampshire, Massachusetts, Rhode Island and Connecticut, and portions of Pennsylvania, New Jersey, Maine and Canada.

The map, with annual revisions and changes, was published as part of an advertising folder put 'out each year from 1933 to and including 1939 by Howe Caverns Inc. and entitled "Howe Caverns Interstate Road Map". The plaintiffs obtained separate copyright registration for each of these annual editions of the map. The alleged infringing map was prepared by the defendant, and appears in the annual Howe Caverns folder for 1940.

The complaint in separate causes of action alleges infringement by the defendant of the 1933, 1937, 1938, and 1939 maps. The answer is in substance a denial both of the validity and of the infringement of the copyrights; it also alleges specifically that the copyrights are void because of a "plurality of registrations". The defendant has, however, conceded that the 1933 and 1937 maps were copyrightable.

The plaintiffs are map makers and publishers doing business at Chester, Vermont, under the names of National Survey Company. Their specialty is the production of road maps designed to advertise various hotels, scenic attractions and places of interest catering to the tourist trade. Examples of such maps are the Consolidated Tours maps published regularly each year by the plaintiffs, and widely distributed throughout the territory covered.

Prior to the engagement of the plaintiffs to make the 1933 map, Howe Caverns Inc. had employed other map makers to prepare its annual road maps. The first of these maps (of which there were two editions) was put out in 1929, and was made by United States Survey Co. Inc. The same company also made the 1930 map. In 1931, the present defendant was given the contract, but in the following year, namely, 1932, United States Survey Co. Inc. was again employed, and made the map for that year. All of these different maps covered much the same general area as that of the plaintiffs' maps.

In the fall of 1932 the plaintiffs opened negotiations with Mr. Clymer, the treasurer

of Howe Caverns Inc., for the contract for the 1933 folder, and at the outset Mr. Clymer insisted that the copyright should be taken out by Howe Caverns Inc. This was objected to by Mr. Lawton V. Crocker, one of the plaintiffs who pointed out in the correspondence which followed that the map would be constructed from "copyrighted base maps prepared at great expense", and that the material could not be adequately protected unless the plaintiffs had the copyright. This view was finally accepted by Mr. Clymer, but it was agreed that Howe Caverns Inc. would have a non-transferable "copyright release" as to limited "sections of any map" made by the plaintiffs for Howe Caverns Inc. when used on letterheads, souvenir folders, or in connection with display advertising.

The contract for the 1933 folder was entered into on December 14, 1932, and incorporated by reference, the agreement with respect to the qualified "copyright release" as to limited sections of the map. It called for the production and delivery by the plaintiffs of 250,000 folders for 1933, and referred to a "dummy" which had theretofore been supplied by Mr. Clymer. In the correspondence preceding the letting of the contract, Mr. Clymer had furnished the plaintiffs with copies of the 1931 and 1932 folders, and had given detailed specifications with respect to some changes he wished made in the 1932 folder, and in the manner in which a number of the roads were there portrayed.

The plaintiffs used in the preparation of the 1933 map two of their Consolidated Tours maps; from these maps a bromide print was made which served as a base for the Howe Caverns map. The Consolidated Tours maps had been built up over a considerable period, and were kept up to date by constant checking and revision. Mr. Lawton V. Crocker described how the data appearing on these maps was obtained: visits were made to state capitals; detailed maps and cuttings were sent to county superintendents and engineers, and to local highway departments, for corrections, changes and omissions; personal investigations were made by travelling investigators and field representatives; and the data was carefully checked and analyzed before it was used in the maps.

Starting with the bromide print made from the Consolidated Tours maps, the plaintiffs prepared an original drawing on which they placed the different roads, towns and places to be shown. Mr. Clymer had established a policy of eliminating many of the secondary roads, and wanted only important towns and junction points to appear. This determined to some extent the selection of the roads, towns, and places, but it still left to the plaintiffs the arrangement and presentation of the material, and the selection of a considerable number of other towns and places which the plaintiffs had found from their long experience with the Consolidated Tours maps would be helpful in securing a wide distribution of the folders and in bringing business to Howe Caverns.

The 1933 map in its completed form had an angular border, and showed Howe Caverns near the center of the area with a large red arrow pointing to the location. The important roads in the immediate vicinity appeared in red and the remaining roads in black. At the top of the map was a diagrammatic floor plan of the caverns with a pink background. The side and bottom margins contained a long list of places of interest with accompanying data, together with a schedule showing the distances of various towns from Howe Caverns. The map carried a copyright notice reading "Copyright, National Survey Co., Chester, Vt. Any portion of this map or folder may be used by newspapers or magazines if our copyright notice appears."

The maps for 1934, 1935 and 1936 were substantially the same as the 1933 map, except that in each of these three years new matter was added and changes were made, largely in the interest of keeping the map up to date. In the negotiations for the 1936 map, Mr. Clymer again adverted to the question of the copyright, and suggested that the copyright notices be changed to state "that the map only is copyrighted", because "some people think that the whole folder is copyrighted". This suggestion was accepted by the plaintiffs, and resulted in a new notice ,which appeared for the first time on the 1936 map, and was continued in the 1937, 1938 and 1939 editions, reading as follows: "Copyright, National Survey Co., Chester, Vt. This copyright applies to the map only and permission is given to reproduce any portion of it in newspapers and magazines if the above copyright notice appears."

The map was completely redesigned by the plaintiffs in 1937, and presented an entirely different appearance from that of the previous maps; the border of the map was

circular instead of angular as in the earlier editions; Howe Caverns was shown at the exact center of the circle, and was marked by a red pennant supported by a long tapering staff; the area was in some places reduced and in others expanded to accomodate itself to the circle; the main through roads leading to Howe Caverns were shown in red throughout the territory; and two scrolls were introduced to carry a portion of the textual matter and the schedule of distances. The idea of the circular border came from one of the directors of Howe Caverns Inc., but the manner of execution devolved entirely on the plaintiffs. The problem was not merely to draw a circle around the desired area but to make the necessary adjustments in the territory so as not to impair the accuracy or the character of the map. The plaintiffs did this work with considerable skill, particularly in the way they distorted the territory between Buffalo and Rochester in order to bring it within the circle. They originated and designed the pennant and staff. They also designed the scrolls and placed them in balanced positions on the map to add to its general appearance.

The 1938 and 1939 maps contained changes and additions of a type similar to those made in the 1934, 1935 and 1936 maps; in other respects they were practically the same as the 1937 map. The 1939 map showed a total of 547 towns, and these towns were substantially the same as those appearing on the plaintiffs' earlier maps.

The order for the 1940 folder was given to the defendant by Howe Caverns Inc. on October 14, 1939. The instructions from Mr. Clymer were that "the map should cover the same territory and put in a circle like the present folder", that no secondary roads should be shown "that are not on our present map", that there should be "no additional roads, except to bring the map to date on principal roads, and no additional towns * * * except those shown on our map". It was also stated that the "pennant, staff and star with the black center are the best we have had so far".

With these instructions, the defendant proceeded to construct the 1940 map. The drafting was done by Van Ess, a draftsman in the employ of the defendant. Van Ess testified that he was instructed to use the 1931 Howe Caverns map, which had previously been made by the defendant, and to modify and bring it up to date to show only those matters appearing in the 1939 map. To accomplish this, he took a fresh sheet of drawing paper, and drew a circle, using as a radius the distance between Howe Caverns and Niagara Falls. He next cut out the area of the 1931 map which fell within the circle, and pasted it on the new sheet of paper within the circle. Then he proceeded to modify the drawing to show only those matters appearing on the 1939 map. He said that what he added to the drawing was taken from the defendant's source materials as appearing in the defendant's regular oil company road maps. He also said that the roads were drawn in from the base maps, and that the towns which were added were shown as they appeared in those maps.

After Van Ess had completed his work, a blueline print of the drawing was prepared and turned over to Bacon, another employe of the defendant, by whom it was examined and checked. A photostat print was then made and forwarded to Mr. Clymer for approval. Mr. Clymer was not satisfied with the map as shown in this print because it covered a larger area than the 1939 map, and the roads had too many curves. To meet these criticisms, the defendant reduced the diameter of the circular border to cover the same area as the 1939 map, and straightened out the roads. In cutting down the area of the map, it was found necessary to distort the territory between Buffalo and Rochester, and this was done in the same way that the plaintiffs had distorted the 1937 map.

The defendant's 1940 map in its final form is identical in design, arrangement and general appearance with the plaintiffs' 1939 map. It has the same circular border; covers the same territory; has the same pennant and staff at the center of the circle; has the same scrolls and general setting; and shows the same roads, and all but one of the 547 towns appearing on the plaintiffs' map. Even a careful observer would have difficulty in finding any substantial differences between the two maps.

First, as to the validity of the copyrights. With the concession of the defendant that the plaintiffs' 1933 and 1937 maps were copyrightable, there is little left to consider on this branch of the case other than the question of "plurality of registration" raised by the defendant's answer. As I understand the contention, it is merely that some of the annual revisions of the

map do not contain sufficient new matter to warrant separate registration. The suit involves only two of the annual revisions, namely, the ones for 1938 and 1939, and as to those the evidence is clear that various changes and additions were made to bring the earlier map up to date. These annual revisions were proper subjects of copyright, and the copyright attached only to the new matter appearing on each, respectively. Adventures in Good Eating v. Best Places to Eat, 7 Cir., 131 F.2d 809; Freedman v. Milnag Leasing Corporation, D.C., 20 F. Supp. 802; Sauer v. Detroit Times Co., D. C., 247 F. 687, 689.

The plaintiffs make no claim to the textual material appearing in the folder outside the limits of the map itself. This is fully in keeping with the language of the disclaimer notice on the 1936 and subsequent maps, stating that the copyright "applies to the map only". The issue is thus reduced to the selection and arrangement of the material on the map itself, together with the manner of presentation or portrayal of the component parts in the map as a whole. General Drafting Co. v. Andrews, 2 Cir., 37 F.2d 54; Deutsch v. Arnold, 2 Cir., 98 F.2d 686. The design and setting of the map are part of the presentation or portrayal, and are protected by the copyright.

Second, as to infringement. The position of the defendant on this branch of the case is that it built up the 1940 map from its own base materials, and used the plaintiffs' map only as an "index of matters to be shown". I do not think though that it can be seriously disputed that the defendant's 1940 map is almost an exact replica of the plaintiffs' 1939 map, which, in turn, closely follows the plaintiffs' 1937 map. Indeed, counsel for the defendant concedes in his brief that the two maps are "superficially similar". Every important feature of the plaintiffs' 1939 map has been reproduced, and almost every road and town taken. Even Van Ess, the draftsman of the defendant's map, admitted, when questioned about the towns and roads, that his instructions were to put on the map "such items as appear on the 1939 map". The similarities between the two maps are so striking and so complete that they point unmistakeably to copying. It is no answer that the defendant was acting on instructions from Howe Caverns Inc., for the plaintiffs alone held the copyrights under their agreement with Howe Caverns Inc.,

and the correspondence shows that it was the clear intent of the agreement that the plaintiffs should have the sole right to copyright. This is decisive on any question of proprietorship. W. H. Anderson Co. v. Baldwin Law Pub. Co., 6 Cir., 27 F.2d 82.

There is some internal evidence of copying in the defendant's 1940 map. The plaintiffs' 1939 map shows five arbitrarily abrupt road endings at points short of the actual highway endings. These five peculiarities of the 1939 map appear at Mineola, N. Y., Picton, Ont., Eaglesmere, Pa., Woonsocket, R. I., and Fairlee, Vt. All five have been reproduced on the defendant's 1940 map, and are the only abrupt road endings shown in that map. The defendant's own base maps did not have these abrupt road endings, and Van Ess could give no satisfactory explanation as to why they appeared on the map. The plaintiffs' 1939 map also shows the town of Old Fort, Pa., which appeared on none of the defendant's base maps. Van Ess testified that he had difficulty in locating this town but finally found it on a Pennsylvania county map.

There is evidence, too, that the defendant copied the plaintiffs' distortion of the territory between Buffalo and Rochester. In the plaintiffs' 1937 map this distortion was brought about by foreshortening the area in that vicinity, which threw the distorted portion of the territory out of scale. The spillover beyond the circle was, however, left unaffected. The defendant's 1940 map shows the same distortion of the territory and the same spillover beyond the circle. It is quite true that the defendant performed the work of foreshortening the area independently, but I do not believe it could have reached the result it did without working back from the plaintiffs' map. This is fairly evident from the fact that the defendant did not resort to the distortion at all until after Mr. Clymer had indicated his dissatisfaction with the first draft of the map submitted by the defendant. The roads and towns in the area covered by the distortion are not in complete registration on the two maps, but they are so close as to amount to substantial identity.

It will be seen from what has already been said that the defendant in its preparation of the 1940 map went far beyond any legitimate use of the plaintiffs' maps. W. H. Anderson Co. v. Baldwin Law Pub. Co., 6 Cir., 27 F.2d 82. I con-

clude, therefore, that the plaintiffs' copyrights of the 1933, 1937, 1938 and 1939 maps are valid and have been infringed by the defendant's 1940 map.

There may be a decree in favor of the plaintiffs, holding the plaintiffs' copyrights of the 1933, 1937, 1938 and 1939 Howe Caverns maps valid and infringed by the defendant's 1940 Howe Caverns map, and awarding costs to the plaintiffs. It should not be necessary to have a reference, and if there is to be any evidence on damages this evidence should be submitted to the court. The allowance to the attorneys for the plaintiffs will be determined on the settlement of the decree.