Walter E. HAYDEN, individually, and doing business under the fictitious firm name and style of Hayden Map Company, Plaintiff,

v.

CHALFANT PRESS, INC., a corporation, et al., Defendants.

No. 159–58.

United States District Court
S. D. California,
Central Division.

Sept. 30, 1959.

304

Maury, Larsen & Hunt, Los Angeles, Cal., and Porter C. Blackburn, Burbank,

Cal., by George R. Maury, Los Angeles, Cal., for plaintiff.

Lyon & Lyon, by R. Douglas Lyon, Los Angeles, Cal., for defendants.

YANKWICH, District Judge.

Walter E. Hayden, a resident of Los Angeles, California, is a cartographer-map maker doing business in Los Angeles under the name of "Hayden Map Co.". He will be referred to hereinafter as "Hayden". Chalfant Press, Inc., a California corporation, is engaged in printing and publishing, with its main office in Bishop, Inyo County, California. It will be referred to as "Chalfant".

This action for infringement of copyright was instituted by Hayden against Chalfant, certain individual officers or employees of the corporation, namely, Abard Todd Walkins, President, Allan J. O'Connor, Robert Frank and Lorin Ray, and certain other individuals who are members of the unincorporated Mono County Chamber of Commerce, namely, Benno Heune, Joseph Beets, Jack Fair and Dewey Kirk. Injunction against future use of certain maps copyrighted by Hayden and damages and profits for past use are sought.[1]

Hayden, for a great number of years, has prepared and circulated outing maps of a certain portion of northern California, being in Inyo and Mono counties, known for its appeal to lovers of the outdoors interested in camping, swimming, fishing, hunting and other typical western outdoor recreations and sports. As he gathered new data, new maps were issued from year to year. The basic maps with which we are concerned in this litigation were the maps copyrighted in 1933 and 1934 and revisions of them issued in 1936, 1938, 1939 and 1950. Hayden claims prior copyrights to maps which are not before us. His Complaint charges all the defendants with copying the maps in 1953, 1954, 1955, 1956, 1957 and 1958. But the proof showed that Chalfant and its employees published "Hayden type" maps only in their "Inyo-Mono Fishing and Vacation Guides" for the years 1955, 1956, 1957 and 1958. Other maps not claimed by Hayden were used in the guides before 1955. The defendants who are members of the Mono Chamber of Commerce are charged with publishing and circulating copies of the same maps in the form of single or multiple sheet maps during the same period. And the proof covered the entire period back to 1953. The claims against both Chalfant and the individual defendants were first asserted by letters written on June 12, 1957. The defendants have denied infringement, have attacked the validity of the copyright and have pleaded other defenses to be referred to in the discussion to follow. First, however, we advert briefly to certain accepted principles relating to the copyright of maps.

### I

#### Originality In Maps

By specific provision of the Copyright Act maps are the subject of copyright.[2] They have been so recognized from the beginning of our jurisprudence on the subject. In an old case Mr. Justice Story, sitting at circuit, defined the requirement as to originality of maps, which is a good guide even today, when he wrote:

"A man has a right to the copyright of a map of a state or country, which he has surveyed or caused to be compiled from existing materials, at his own expense, or skill, or labor, or money. Another man may publish another map of the same state or country, by using the like means or materials, and the like skill, labor and expense. * * * If he copies substantially from the map of the other, it is downright piracy; although it is plain that both maps must, the more accurate they are, approach nearer in design and execution to each other."[3]

---

1. 17 U.S.C.A. § 101.

2. 17 U.S.C.A. § 5(f).

3. Emerson v. Davies, C.C.Mass., 1845, 8 Fed.Cas. pp. 615, 619, No. 4,436.

■ Of necessity, except in the case of territories which have not been mapped by the States or the United States, originality in map making is confined to original designations of mountains, lakes, rivers, trails and roads and other contours and configurations of the territory, and of their names. So the cases which have dealt with the problem have limited the claim of originality and copyrightability to such designations or notations as are novel with the cartographer and *are not* to be found in the basic topographic maps prepared by the Government of the United States or the States or by individuals. Hence, any claim of infringement must be confined to the "lifting" of these novel additions of the particular cartographer. Rightly. For while territories undergo certain changes through erosion and other climatic phenomena, the terrain remains very much the same throughout the years. And the cartographer should be limited to what, by the expenditure of labor and money, he was able to discover in the territory and note *on his maps* which *was not noted* on the basic official or other maps.[4]

■ In order not to give to a cartographer a permanent monopoly which would enable him, *without renewing his copyright*, to begin a new copyright period every year, the courts limit copyrightability of *periodical revisions* of such maps *to the new matter appearing*

on them.[5] At best, therefore, originality as to maps is very narrow in scope, because of the nature of the art which consists merely of depicting, on a map, *in an accepted form*, the topography of a terrain. Indeed, the originality is more limited even than the slight degree of originality required in copyrighted works in general.[6]

## II

### Access

In dealing with materials like maps, which are purely descriptive of terrains, the courts have, at times, looked not only for similarities, but for identity of errors, either in names or other data, as indicating access to the copyrighted material.[7]

Much of the testimony of access in the case before us consisted of stressing similarities and errors. *For there is no credible proof of direct copying by Chalfant or the individual defendants of Hayden's maps.* On the contrary, the uncontradicted testimony offered by the defendants is that the maps published by Chalfant and those published by the individual defendants, who were members of the Mono County Chamber of Commerce, were traced from maps of the region published by the Automobile Club of Southern California, to be referred to as "the Automobile Club" or "the Club", superimposed upon the topographical maps of the two counties. The defendants were able to produce the original

4. Perris v. Hexamer, 1878, 99 U.S. 674, 675, 25 L.Ed. 308; Woodman v. Lydiard-Peterson Co., C.C.Minn., 1912, 192 F. 67, 69–70; General Drafting Co., Inc. v. Andrews, 2 Cir., 1930, 37 F.2d 54; Andrews v. Guenther Pub. Co., D.C.N.Y.1932, 60 F.2d 555; Amsterdam v. Triangle Publications, Inc., 3 Cir., 1951, 189 F.2d 104; Freedman v. Milnag Leasing Corporation, D.C.N.Y.1937, 20 F.Supp. 802; Crocker v. General Drafting Co., Inc., D.C.N.Y.1943, 50 F.Supp. 634.

5. Crocker v. General Drafting Co., supra note 4; Freedman v. Milnag Leasing Corporation, supra Note 4; Sauer v. Detroit Times Co., D.C.Mich.1917, 247 F. 687, 690; Adventures in Good Eating, Inc. v. Best Places to Eat, Inc., 7 Cir., 1942, 131 F.2d 809, 813.

6. Jeweler's Circular Pub. Co. v. Keystone Pub. Co., 2 Cir., 1922, 281 F. 83, 26 A.L.R. 571; College Entrance Book Co., Inc. v. Amsco Book Co., Inc., 2 Cir., 1941, 119 F.2d 874, 876; Alfred Bell & Co. v. Catalda Fine Arts, Inc., 2 Cir., 1951, 191 F.2d 99, 102–103; Wihtol v. Wells, 7 Cir., 1956, 231 F.2d 550, 553.

7. Callaghan v. Myers, 1888, 128 U.S. 617, 662, 9 S.Ct. 177, 32 L.Ed. 547; W. H. Anderson Co. v. Baldwin Law Pub. Co., 6 Cir., 1928, 27 F.2d 82; R. R. Donnelley & Sons Co. v. Haber, D.C.N.Y. 1942, 43 F.Supp. 456, 458; General Drafting Co., Inc. v. Andrews, supra note 4, 37 F.2d at page 57. And see, Jeweler's Circular Pub. Co. v. Keystone Pub. Co., supra note 6, 281 F. at pages 93–95; List Pub. Co. v. Keller, C.C.N.Y., 1887, 30 F. 772–774.

tracings from which the published maps were thereafter made and the men who made them. *Additional notations were made from the maps of the region published by the National Automobile Club* and facts as to new trails and roads known to the persons who traced the maps for the defendants.

■ Ordinarily, one who copies from a copy which infringes does not escape responsibility.[8] However, there is no proof of access or copying. In this case the fact whether copying occurred is of utmost importance in view of the conclusion we have reached that Hayden, although knowing that the Automobile Club had been printing the maps, from which the defendants copied theirs, with additions, took no action against them. To the contrary, half a million of these maps were distributed by the Automobile Club with a notice of copyright. Yet, for over nineteen years no action was brought against the Automobile Club by Hayden.

■ Ordinarily, the failure to take action against a stranger does not give rise to estoppel.[9] But in this case, conceding the originality of Hayden's maps, his failure to institute proceedings constituted an estoppel not only against the Automobile Club, but also against the defendants, who were authorized by the Automobile Club, through a Mr. Crosby, to reproduce the maps which Hayden now claims were, in turn, copied from his. This statement calls for a more detailed discussion of the question of estoppel.

### III

### Estoppel

■■ In dealing with estoppel it is well to bear in mind the distinction between the effect of laches in a case of this character and the effect of estoppel. Laches, resulting from long delay in enforcing one's rights, followed by change of position of the party relying on the other party's inaction, might result in denial of equitable relief, such as injunction and recovery of profits. But it would not stand in the way of the granting of damages for the unauthorized copying or of injunction against future violations.[10] To the contrary, *estoppel destroys the very rights which it is sought to assert.*[11] As said in one of the cases already cited:

*"The effect of one being estopped to enforce a claim is that his plight is substantially the same as it would*

---

**8.** 18 C.J.S. Copyright and Literary Property § 94(c) (1), p. 217; Gilmore v. Anderson, C.C.N.Y.1889, 38 F. 846; American Press Ass'n v. Daily Story Pub. Co., 7 Cir., 1902, 120 F. 766, 769–770; Stevenson v. Fox, D.C.N.Y.1915, 226 F. 990; Toksvig v. Bruce Pub. Co., 7 Cir., 1950, 181 F.2d 664, 666–667.

**9.** W. H. Anderson Co. v. Baldwin Law Pub. Co., supra note 7, 27 F.2d at pages 88–89.

**10.** 18 C.J.S. Copyright and Literary Property § 130, p. 244; McLean v. Fleming, 1877, 96 U.S. 245, 256–258, 24 L.Ed. 828; Menendez v. Holt, 1888, 128 U.S. 514, 523–525, 9 S.Ct. 143, 32 L.Ed. 526; West Pub. Co. v. Edward Thompson Co., 2 Cir., 1910, 176 F. 833, 838; Ford v. Huff, 5 Cir., 1924, 296 F. 652; Gilmore v. Anderson, supra note 8; Gillons v. Shell Co. of California, 9 Cir., 1936, 86 F.2d 600, 609–611; Kraft v. Cohen, D.C.Pa.1940, 32 F.Supp. 821, 825. And see, 17 U.S.C.A. § 101(a) (b) (c) and (d).

**11.** 31 C.J.S. Estoppel § 148; Heine v. Appleton, 1857, 11 Fed.Cas. page 1031, No. 6,324. In Lawrence v. Dana, C.C. Mass., 1869, 15 Fed.Cas. pages 26, 60–61, No. 8,136, Clifford, Circuit Justice, draws a clear distinction between estoppel by long acquiescence and laches:
"Examined as a question of strict law, apart from exceptional cases, the privilege of fair use accorded to a subsequent writer must be such, and such only, as will not cause substantial injury to the proprietor of the first publication; but cases frequently arise in which, though there is some injury, yet equity will not interpose by injunction to prevent the further use, as where the amount copied is small and of little value, if there is no proof of bad motive, or where there is a well-founded doubt as to the legal title, *or where there has been long acquiescence in the infringement, or culpable laches and negligence in seeking redress, especially if it appear that the delay has misled the respondent."* (Emphasis added.)

*have been if the claim had never existed."* [12]   (Emphasis added.)

A more elaborate statement of the effect of estoppel is found in a case from the Sixth Circuit in which it is said:

"The effect of an estoppel in pais *is to prevent the assertion of an unequivocal right,* or preclude a good defense, and justice demands it should not be enforced unless substantiated in every particular. The concept of the doctrine is fraud, actual or constructive on the part of the person sought to be estopped."[13] (Emphasis added.)

Estoppel inures not only to the benefit of a party but also to those in privity with him or who claim under him, whether as assignees or not.[14] All that is necessary is that the relationship be created "after the event out of which the estoppel arises."[15]

The evidence in the record shows clearly that the maps of the area with the claim of copyright were circulated by the Automobile Club for a period of nineteen years. Hayden knew that they were circulating such maps in 1939 or 1940. Transcript, p. 108–109. As estimated by a witness, Harry P. Pflum, who, since November, 1955, has been manager of the map drafting department of the Automobile Club, and who had been connected with the reproduction of all Automobile Club maps in one capacity or another for seventeen years prior to that date, one half million of these maps, with a copyright claim by the Automobile Club, have been circulated among members of the Club and to the public. So that at the time the Automobile Club granted permission to the defendants, in 1953 or 1954, to reproduce and circulate the maps, the conditions of acquiescence, with knowledge, which estopped Hayden from asserting rights against the Automobile Club had occurred.

The Automobile Club, on the basis of Hayden's nonaction, had incurred great expenditures in publishing these maps. As already appears, Hayden not only knew that they were circulating them, as far back as 1939 or 1940, but admits that he met their field men in the field when they were gathering data which later found their way into their maps. Transcript pp. 99(b)–99(e). The defendants in this case having received permission from the Automobile Club, Hayden is estopped from challenging the rights thus derived. And we have here all the elements of consent, acquiescence with knowledge of infringement over a long period of time, which constitute estoppel, warranting the denial of all recovery to Hayden.[16]

12. Ford v. Huff, supra note 10 [296 F. 657]. Its effect is "to prevent the assertion of what would otherwise be an unequivocal right." 19 Am.Jur., Estoppel, § 40.

13. Grand Trunk Western R. Co. v. H. W. Nelson Co., Inc., 6 Cir., 1941, 116 F.2d 823, 836; Edwin L. Wiegand Co. v. Harold E. Trent Co., 3 Cir., 1941, 122 F.2d 920, 925.

14. 31 C.J.S. Estoppel § 130.

15. 31 C.J.S. Estoppel § 130, p. 397. See 19 Am.Jur., Estoppel, § 152; Van Rensselaer v. Kearney, 1850, 11 How. 297, 325, 13 L.Ed. 703; Arizona Power Corporation v. Smith, 9 Cir., 1941, 119 F.2d 888, 890; Fouke v. Schenewerk, 5 Cir., 1952, 197 F.2d 234, 236. A good statement of the general conditions necessary to give rise to estoppel is found in Cedar Creek Oil & Gas Company v. Fidelity Gas Company, 9 Cir., 1957, 249 F.2d 277, 281–285. While this was a diversity case, governed by State law, the principles of estoppel which state courts apply are the same as those obtaining in federal court, as the references in this and the preceding notes show. Indeed, they all go back to a famous statement by Lord Coke:

"It is called an estoppel or conclusion, because a man's own act or acceptance stoppeth or closeth up his mouth to allege or plead the truth." 2 Coke's Littleton, 352a. See Sprigg v. Bank of Mt. Pleasant, 1836, 10 Pet. 257, 265–266, 9 L.Ed. 416.

It debars one from speaking after he remains silent "when in conscience he ought to speak". Gamble v. Cornell Oil Company, 10 Cir., 1958, 260 F.2d 860, 871, quoting, *with approval,* Pomeroy, Equity Jurisprudence, 4th ed., Vol. 2, § 818.

16. 19 Am.Jur., Estoppel, § 62, pp. 676–679. The defendants are entitled to assert

## IV

### Independent Production

In what precedes it has been assumed that the Automobile Club maps which the defendants copied were, in turn, copied, in part, at least, from Hayden's map. There is evidence, however, of such dissimilarities between the Hayden and Automobile Club maps as to warrant the conclusion that what was taken did not exceed the limits of "fair use" as that term is understood in the law of copyright.[17] The Automobile Club may have had access to Hayden's maps. However, there is credible evidence in the record to warrant the conclusion that the maps on which they claimed copyright and which they authorized the defendants to copy were independent productions from field data gathered by their representatives in the field and the use of topographical maps of the United States which are in the public domain and the common property of all. This appears clearly from the testimony of Harry P. Pflum, who has already been referred to and who outlined the Club's method followed in map making which was substantially as follows:

In producing outing maps of the type involved here, United States government or forestry service topographical sheets of the district were procured. From

this right whether they were technically assignees of the copyright (17 U.S.C.A. § 28 et seq.) or not. For having been given the right to copy they also acquired the right to multiply, sell or distribute the maps so copied. See Bong v. Alfred S. Campbell Art Company, 1909, 214 U.S. 236, 245–247, 29 S.Ct. 628, 53 L.Ed. 979. And see American Tobacco Company v. Werckmeister, 1907, 207 U.S. 284, 292–296, 28 S.Ct. 72, 52 L. Ed. 208; H. M. Chandler Co., Inc. v. Penn Paper Products, Inc., D.C.N.Y. 1950, 88 F.Supp. 753, 754.

17. See the writer's article "What is Fair Use", 1954, 22 U. of Chi.L.Rev., 203, 208–215; Mathews Conveyer Co. v. Palmer-Bee Co., 6 Cir., 1943, 135 F.2d 73, 85; Toksvig v. Bruce Pub. Co., supra note 8, 181 F.2d at pages 666–667; Eisenschiml v. Fawcett Publications, Inc., 7 Cir., 1957, 246 F.2d 598.

The continuity of judicial thought in this respect is evidenced by the fact that the same criteria were set forth in very early English and American cases. See Cary v. Kearsley, 1802, 4 Esp. 168, 170; Folsom v. Marsh, 1841, 9 Fed.Cas. pages 342, 348, No. 4,901 *(per Mr. Justice Story, sitting at circuit)*. The English case just cited, Cary v. Kearsley, supra this note, presents an analogy to the case before us. In that case the plaintiff had copyrighted a book on roads. The defendant published a similar work in which the names of places and other data were the same. Indeed, *several errors which had crept into the plaintiff's book in the printing found their way into the defendant's also.* Lord Ellenborough stated the problem which he would submit to a jury in this manner:

"That part of the work of one author is found in another, is not of itself piracy, or sufficient to support an action; a man may fairly adopt part of the work of another: he may so make use of another's labours for the promotion of science, and the benefit of the public: but having done so, the question will be, Was the matter so taken used fairly with that view, and without what I may term the *animus furandi?* Such as was the case put by Mr. Erskine of Paley's Philosophy. Look through the book, and find any part that is a transcript of the other; if there is none such; *if the subject of the book is that which is subject to every man's observation; such as the names of the places and their distances from each other, the places being the same, the distances being the same, if they are correct, one book must be a transcript of the other; but when, in the defendant's book there are additional observations, and in some part of the book I find corrections of misprinting * * * while I shall think myself bound to secure every man in the enjoyment of his copyright, one must not put manacles upon science."* p. 170. (Emphasis added.)

After Lord Ellenborough stated that he would address these observations to the jury, leaving it to them to determine whether the material was taken with a view of compiling a useful book in which the matter taken was rearranged or "taken colorably merely with a view to steal the copy-right of the plaintiff," counsel for the plaintiff, the great Thomas Erskine, *sensing defeat,* consented to a nonsuit.

these tracings were made on tracing cloth. Then the outing crew went into the field and checked the maps. The Club has had such checking crews during the entire time of the witness' employment, dating back twenty-one years.

When the Automobile Club maps here involved were made, four people were employed in the field. They were going constantly from one area to another mapping them. They would bring in notes or data that they secured on the ground. C. B. Harrison, who was manager of the outing bureau, had interviews and secured information from packers, sportsmen and sports stores, and travelled extensively through the entire valley as a part of the field operations. He also secured information from rangers or park administrators, who were willing to give the information because the Club reciprocated by giving them the completed maps, without charge, in return for the information.

Originally the maps were all hand lettered. In the last ten years the Club produced maps that were typeset. All the information gathered by the field men and their field books were filed with the Club. The field trips extended all over the State and covered the Inyo-Mono counties area which the accused maps depicted. The maps when produced bore the legend "Copyright by the Automobile Club of Southern California" and freely acknowledged the assistance of various agencies referred to in securing data. One such acknowledgment, which is typical, reads:

"Permission to use certain information on this map, compiled by the late Walter A. Starr Jr. of the Sierra Club, is gratefully acknowledged.

Invaluable assistance in compiling this map was also supplied by the:

| United States Forest Service United States Geological Survey | National Park Service and Packers throughout the area covered." |

The maps were made available free to the members of the Club, all kinds of civic organizations, civil defense groups, police departments and the California State Highway Patrol.

■ Although C. B. Harrison, who secured some of the information, was not available as a witness,—as he had severed his connection with the Club and was no longer a resident of California,—the data which he supplied and which went into the files of the Club from which the witness and other persons assisting in the actual making of the maps drew their information were primary evidence, as records made and kept, in the regular course of business.[18] And, of course, the testimony of the witness who, himself, in one capacity or another, had been connected with the map making department for over twenty years and is a professional cartographer gave irrefutable proof of the method of making these maps.

■ It is a cardinal principle of Anglo-American jurisprudence that the testimony of one credible witness is enough to establish the facts he testified to.[19]

It should be borne in mind that the Automobile Club is a large organization maintained by dues and voluntary contributions of its members, rendering

18. 28 U.S.C.A. § 1732(a); See C. S. Johnson Company v. Stromberg, 9 Cir., 1957, 242 F.2d 793, 798–799; Smith v. Fort Worth & Denver City Railway Company, 5 Cir., 1955, 219 F.2d 43, 45.

19. Audett v. United States, 9 Cir., 1959, 265 F.2d 837, 846–847 and cases cited in notes 45 and 46 of that opinion.

service not only to them but to the automobile using public in the entire State.

■ The first of the maps which Hayden admits seeing was copyrighted in 1940. The fact that at no time did he seek to challenge the right of the Automobile Club to use these maps lend support to the thought that Hayden, himself, considered the Automobile Club maps independent productions entitled to copyright and not maps plagiarized from his. These facts and the many dissimiliarities between the Hayden and Automobile Club maps warrant the conclusion that the maps were the independent product of the Automobile Club, which the defendants had the right to copy and distribute.

■ Hayden, as a witness, made much of the fact that he had given names to certain unnamed places: lakes, creeks, trails, hills or peaks. One gathered the impression that by giving them names, *he thought* that he acquired the exclusive right of having maps with such names on them. But this is not the law. For by giving the names Hayden granted to everyone the right of having the names used, so that field crews or sportsmen coming into the field later would know, either through markings or signs or through the mouths of settlers or packers in the district, that the peaks, lakes and creeks, trails and roads and other physical configurations of the terrain had been "christened" and were, henceforth, to be known by such names.

In the last analysis, the presence of such names in subsequent maps, if they appeared soon after the maps, might indicate that they may have been taken from Hayden's maps. But this *would be merely evidence of copying, not of plagiarism.* Indeed, it is evident that the Government's maps, subsequent to 1940, contain many designations which Hayden claims to have given first to certain configurations. So the conclusion is warranted that the Automobile Club maps, *which the defendants copied,* were produced as a result of the Club's research. And if any similarities between these maps and Hayden's exist, they are fortuitous, due to the fact that the manner of depicting a mountain, stream or lake, trail or road, is identical, whoever does the research in the field. And after a creek, lake, trail or road have been located and been given a name, a subsequent cartographer may designate any of them, and give to them the same names without being guilty of infringement of the copyright of the first cartographer.

Summary and Conclusion

The antecedent discussion warrants the following conclusions:

Hayden's maps, copyrighted by him and attached to his Complaint, contain sufficient material original with him to be copyrightable.

The maps published by the defendants were not copied from Hayden's maps. On the contrary, they were copied, *with additions,* from maps prepared by the Automobile Club and copyrighted by them beginning in 1940. The copying and use by the defendants were with the permission of the Automobile Club.

The maps of the Automobile Club were independent productions, copyrighted by them, consisting of material which was either in the public domain or was a "fair use" of preceding maps or from field notes prepared by the Club's map making crews working in the territory.

Hayden, by his failure, with knowledge of the existence of the Automobile Club maps, to claim infringement over a long period of years, while these maps were being distributed in hundreds of thousands of copies, is estopped to claim infringement by any of the defendants to whom the Automobile Club gave permission to copy *their* maps.

■ As to the individual defendants, I also find that they are or were either officers or employees of the Chalfant Press who assisted in getting the maps ready for insertion into the Guide, or unpaid members or officers of a non-profit organization, the Chamber of Commerce of Mono County, which distributed the maps without profit to itself and without charge to anyone in order to promote the interests of the region, as has been done

from time immemorial by Chambers of Commerce everywhere. For this reason also no personal liability should attach to their actions, even if it existed against their principals. *As appears, none has been shown against anyone.*

 Judgment will, therefore, be for the defendants that plaintiff take nothing by the Complaint. Costs to the defendants. No attorneys fees. Findings and Judgment to be prepared by counsel for the defendants under Local Rule 7, West's Ann.Cal.Code.[20]

20. In this case the defendants pleaded that the materials claimed in the Hayden copyrighted maps were source materials in the public domain (Answer, Par. XV). In a sense estoppel may be one of the ways of showing that, as to a particular defendant, the material became a part of the public domain. Estoppel must be specially and affirmatively pleaded. Rule 8(c), Federal Rules of Civil Procedure, 28 U.S.C.A.; Girard v. Gill, 4 Cir., 1958, 261 F.2d 695, 697–699. Here, estoppel was treated by the court and the parties as an issue under the facts in the case. Therefore, a finding of estoppel is within the issues and is in order, despite any apparent defect in the pleadings and without amending the Answer to conform to the evidence. Rule 15(b) Federal Rules of Civil Procedure. The findings may state these facts and the Answer may stand amended to "conform to the evidence" or counsel for the defendants may file an amendment to their Answer so "conforming".