## GENERAL DRAFTING CO., Inc., v. ANDREWS et al.

Circuit Court of Appeals, Second Circuit.
January 6, 1930.

No. 174.

Knight Bros., of New York City (Ray T. Ernst, of New York City, of counsel), for appellant.

Nathaniel Cohen, of New York City, and Donald F. Ayres, of Brooklyn, N. Y., for appellees.

Before L. HAND, SWAN, and MACK, Circuit Judges.

MACK, Circuit Judge. An injunction and statutory damages for the alleged infringement of four copyrighted automobile road maps was sought by and denied to plaintiff, appellant. The maps are entitled (1) "Standard Road Map of New Jersey and Contiguous Territory," published in 1923; (2) "Socony Road Map of New England 1925"; (3) Socony Road Map of New York 1925"; and (4) "Tourist Map of Pennsylvania," published in 1925. The alleged infringement consists of a single composite map entitled "Cleartype Road Map, featuring Main Travel Routes within the Greater Metropolitan Area," published in 1926; it covers the greater part of New Jersey, the eastern portion of Pennsylvania, the southern part of New York, and Connecticut.

Automobile maps similar to those in suit are clearly the subject of copyright within section 5(f) of the Copyright Act (17 U. S. C. § 5(f), 17 USCA § 5(f); see Woodman v. Lydiard-Peterson Co. [C. C.] 192 F. 67), and are also compilations, abridgements, adaptations, or arrangements of previously copyrighted materials or works in the public domain within section 6 (17 U. S. C. § 6 [17 USCA § 6]). We need not discuss the authorities either in this or in other jurisdictions; they were fully considered by this court in Jeweler's Circular Publishing Company v. Keystone Publishing Company, 281 F. 83, 26 A. L. R. 571, and the writer reviewed them in W. H. Anderson Co. v. Baldwin Law Publishing Company, 27 F. (2d) 82 (C. C. A. 6th).

In order properly to determine the sole issue before us, that of infringement, it is necessary to outline briefly the method by which the maps were prepared and to indicate the features which render them the subject of copyright. The method pursued by plaintiff in preparing its New Jersey map is typical. Two sets of topographical maps prepared by the Geological Survey of the Department of Interior, covering the desired area, were secured; through personal interviews, detailed information concerning road conditions was obtained from the county engineers in each New Jersey county and was recorded on one of the Geological Survey maps. The condition of each road was designated as "first class," "second class," or "third class," having regard solely to its availability for automobile travel. In addition, the actual physical condition of the road was in many cases verified by travel. The detailed information thus collected was transferred to a base map composed of a large number of individual Geological Survey maps. At this stage, the process of selection was begun; a large tracing was made of the assembled section maps, but only such information as the mapmaker thought would be of use to motorists was taken over —that is, selected highways, rivers, towns, state lines, etc. The relative condition of each road was indicated on the tracing by a double, heavy single, or thin single line. The large tracing was photographically reduced to the desired size; a smaller tracing was then made, on which the information was finally audited and corrected before the final map was "hand drawn" from this tracing. Considerable variation in road meanderings, shore lines, position of town and population symbols, and general scale are usual in order to accommodate the printed matter which is "hand-stamped" on the final map; consequently the maps of each mapmaker possess a final individual appearance and style.

Comparison of the base maps and sectional or detail maps with the finished product show a considerable amount of originality in preparation. The final maps are manifestly different from those used in making them, and represent a great deal of skill, labor, and expense. The elements of the copyright consist in the selection, arrangement, and presentation of the component parts. Plaintiff's maps in suit have acquired a very considerable reputation, and are sold in great numbers to the highway departments of the several states and to a number of the larger motor fuel companies.

■ (1) It is conceded that, if defendants' map had been constructed after an independent investigation of the original sources in the public domain, without copying, plaintiff's case would fail. Superficially the maps are not alike. Somewhat different symbols are used to indicate population sizes; different markings are employed to indicate road conditions; defendants' map is a single composite map covering a large area, embracing that covered by four of plaintiff's maps. But in our judgment plaintiff established a strong prima facie showing of copying by pointing out a convincing number of similarities in style, appearance, and selection of roads and towns, and a relatively great number of identical errors and peculiarities in spelling between its and defendants' maps. It is not necessary to review all of these common errors, ably and clearly presented by counsel; it suffices to point out a few of the more striking ones: (a) Plaintiff introduced a table showing some twenty alleged misspellings common to both maps. While a few of these appear upon examination to be alternative spellings, there are at least sixteen clear mistakes made by plaintiff and repeated by defendants. One or two might have been coincidental or have resulted from the fact that Tudor, who prepared defendants' map, had been employed as a mapmaker by plaintiff; but sixteen common errors (plus some more ascertained at a later date) is so large a number as to leave practically no doubt that he went far beyond the permissible use of plaintiff's maps to compare and check his own independent results, and actually copied plaintiff's work to a considerable extent. (b) Another table showed some seventeen common errors in population symbols, in many cases wrong by several thousands. (c) The inadvertent placing of the Walkill river on the wrong side of the main highway between two New York towns was duplicated on defendant's map. (d) In at least four instances plaintiff had arbitrarily ended roads at a point short of the actual highway endings; these are repeated on defendants' map. (e) Plaintiff further showed that the location of a number of town and city symbols on its maps had been arbitrarily made to accommodate type and provide clear reading space; those on defendants' map coincided almost precisely, but unnecessarily, with plaintiff's. (f) Finally, the meanderings of highways and the general contour of shore lines and rivers, which in maps of this type are rather freely drawn, show striking similarities when transparent prints of plaintiff's maps are superimposed on the Cleartype map. This showing clearly threw upon defendant the burden of going forward with evidence to explain such similarities. Encyclopædia Britannica Co. v. American Newspaper Ass'n (C. C.) 130 F. 460.

■ (2) To meet the prima facie case, defendants offered a single witness, Tudor, who had prepared the alleged infringing map, and who had been employed by plaintiff up to 1925. Tudor introduced a series of exhibits which he stated constituted in part the materials from which he worked. His base maps were road maps procured from the various state highway departments, including a map issued by the New York state department of public works in 1925, which had been prepared by plaintiff, and which bore its copyright. Tudor testified that, in making up the New York portion of his map, he had used Geological Survey section maps on which he had plotted the various highways and had later reduced them photostatically to a small size; that directly from these photostats and from photostats of the New Jersey, Connecticut, and Pennsylvania maps, received from the state highway departments, he had drawn his final map. The intermediate photostats of the New York section maps, as well as that for the inset map of the metropolitan area, were stated to have been lost, and the final map from which the printed map was prepared to have been destroyed. Tudor further testified that he had made his selection of roads and towns by comparing and following maps of other mapmakers, including plaintiff's New York map received from the department, and by using road information obtained through his own and his partners' actual travel between February and April, 1926, as well as from talks with officials of the American Automobile Club, for whom he had done some work.

Denying that he had copied from plaintiff, Tudor ascribed the common errors in part to his familiarity with plaintiff's style of spelling through the years of service, and in part to mere typographical mistakes. To meet the charge of copying population symbols, indicating size of towns and cities, he introduced several pocket guide books and also a copy of the 1920 census, which he testified he had used as general references except in those instances in which he disagreed with his authorities but agreed with plaintiff's maps. As to these, he had estimated the populations shown on the map. His explanation of the arbitrary road endings was that he was not sure whether the roads in question continued on. As to the arbitrary

common location of certain town and city symbols, Tudor, admitting that the positions were indeed arbitrary except when placed at the approximate site of a city hall, asserted that they represented his independent judgment. At the conclusion of his testimony, the District Court granted plaintiff additional time in which to examine the base map exhibits before cross-examination.

At the supplementary hearing, Tudor's credibility was attacked, and various inconsistencies in his story brought to light. Again we need not review the evidence in detail; we are entirely satisfied that his uncorroborated story was completely discredited. His letters to the several highway departments were indefinite; not a single reply was produced; in several instances, maps which he testified had been secured from governmental agencies, and which he had photostated for use, bore in the photostats the mark of a New York map dealer. In one instance the photostatic reproduction clearly indicated that the date of the original had been altered. In another and extremely significant exhibit, the photostat, from which he testified he had worked when preparing his map, photostatically reproduced markings around seven misspellings (and one wrong name apparently thought to be a misspelling) although he admitted that his attention had been called to the misspellings only when the present suit was brought. Finally, between the pages of the copy of the United States census which he testified he had used in April, 1926, in the preparation of his map, was found a letter from the Bureau of the Census transmitting the book, dated August 10, 1926. In an attempt to explain these inconsistencies, Tudor modified his original testimony. He stated that some of the photostats were later duplicates, and that his former positive identification of them as the maps with which he had worked was incorrect. The cumulative effect of these corrections, inconsistencies, and shiftings is thoroughly to discredit his entire testimony.

Plaintiff in his brief in this court tabulated additional similarities. Some twenty more identical misspellings are shown, not indicated on defendants' alleged base maps, a tabulated summary of identical peculiarities showed fifty-three on the New Jersey portion, twenty on the inset of the metropolitan area, forty-five on the Connecticut portion, and fifty-three on the New York and Long Island parts. Here again counsel's care in presenting these matters has been of great assistance.

From the entire record, we can find no possible explanation of the mistakes common to both maps, particularly those which do not appear on defendants' alleged base maps, except direct copying. The thorough discrediting of Tudor's testimony but confirms the inherent improbability that the exhibits offered by him could of themselves have formed the basis for his map. The common errors and similarities show a wide variety; selection of roads, peculiarities of road meanderings and classification, selections of towns and location of symbols therefor, population errors, river and shore boundaries, etc. They point in only one direction, that Tudor used plaintiff's map, not for comparison or checking, but for substantial copying. While many of the items are trivial, their very triviality confirms this conclusion, since ordinarily unimportant details would not be verified by comparison.

(3) In the light of this circumstantial proof of copying, we need not consider whether, on Tudor's own admissions that he had plaintiff's maps before him while preparing his own and that he determined the location of a particular highway from plaintiff's copyrighted map, issued by the highway department, he overstepped the limits of comparison with, or permissible use of, authorities. Cf. the Anderson Case, supra, 27 F. (2d) at page 88.

(4) Plaintiff has waived an accounting, but asks statutory damages as provided by section 25(b) of the Copyright Act. 17 U. S. C. § 25 (17 USCA § 25(b). The uncontradicted evidence is that 5,000 copies of the infringing Cleartype map were sold, but it does not appear and it is not alleged that plaintiff's business was materially injured. On the entire record, we are of the opinion that an allowance of $2,000 damages will be adequate. In view of the labor involved in preparing the case for trial and on appeal, there should be a further allowance of $4,000 counsel fees. 17 U. S. C. § 40 (17 USCA § 40).

The decree will accordingly be reversed, and the cause remanded, with directions to enter a decree in conformity with the views herein expressed.