**C. S. HAMMOND & CO., a Corporation, Plaintiff,**

v.

**INTERNATIONAL COLLEGE GLOBE, INC., a Corporation, Harry W. Bobley, Harold L. Crossman, and Sweeney Lithograph Company, Inc., a Corporation, Defendants.**

United States District Court
S. D. New York.
March 30, 1962.
As Amended April 6, 1962.

Byerly, Townsend, Watson & Churchill, New York City, Howard J. Churchill, New York City, of counsel, for plaintiff.

Cadwalader, Wickersham & Taft, New York City, Jacquelin A. Swords, Edward Abbe Niles, William A. Waller, New York City, of counsel, for defendants International College Globe, Inc., Harry W. Bobley and Harold L. Crossman.

McGOHEY, District Judge.

This is an action for copyright infringement and for unfair competition. The parties are publishers of inflatable plastic globe maps of the world. The plaintiff charges the defendants with infringement of its copyright in the map appearing on its globe, and it further charges that the defendants have competed unfairly by so simulating the name and appearance of the plaintiff's globe as to tend to create confusion in the trade

as to the source of the defendants' globe. The findings and conclusions are contained in the opinion.

C. S. Hammond & Co. is a New Jersey corporation.

International College Globe, Inc., now named Standard College Globe, Inc., is a New York corporation.

Harry W. Bobley and Harold Crossman are citizens of New Jersey.

Sweeney Lithograph Co., Inc., is a New Jersey corporation which, though named in the complaint, is not a party to this action since it was never served with process and has not appeared.

The plaintiff is and for sixty years has been engaged in the business of producing maps, atlases, charts and related publications. The name "Hammond" has long appeared on such works and is well and favorably known.

The plaintiff employs about 125 persons of whom at least twenty are editors and at least fifteen are map draftsmen. Their general day-to-day operations include not only drawing new maps but keeping the plaintiff's existing maps up-to-date. The editors keep in touch with governmental agencies of the United States and foreign countries. They keep currently informed concerning population statistics and political events affecting territorial changes. The plaintiff makes every effort to verify all data received by checking against all reliable sources which are available.

The plaintiff employs a full-time professional librarian who keeps current its extensive collection of maps and other geographic data. Most of the plaintiff's editorial staff have had college or equivalent training in geography or cartography.

The plaintiff does no original field surveying. It does original research only when preparing local area maps. This, however, is a very small part of its business.

The plaintiff's procedure in preparing a new map is, generally, as follows. After the area to be shown has been determined, the plaintiff's files are examined to ascertain if there is a suitable base map for the area. If none is available one is made. The compilers next decide what detail is to be shown on the new map, that is to say, what cities and towns, and what physical features, such as drainage areas, etc. The amount and kind of detail added to a base map depends largely on the purpose for which the new map is being produced and its scale.

In 1941 the plaintiff produced and began distribution of a flat map of the world called "Field Marshal Map of the World." In 1945 that name was changed to "Hammond's International Map of the World" (Ex. 1). Under the latter name the map has achieved considerable commercial success. It is one of the best selling items produced by the plaintiff.

On May 16, 1955, the plaintiff first exhibited and placed on public sale, with copyright notice attached, an inflatable globe map of the world entitled "Hammond's International Globe" (Ex. 3). This title was selected because of its similarity to that of the plaintiff's successful flat map of the world (Ex. 1). Each globe map of the world thereafter made and distributed by the plaintiff has contained the foregoing copyright notice. On June 24, 1955, two copies of "Hammond's International Globe," together with an application dated June 22, 1955, were filed in the Copyright Office. Certificate of Registration No. F 19094 Class F was issued to plaintiff. The plaintiff still owns and holds its right, title and interest in that copyright.

At and prior to May 16, 1955, the defendants Bobley and Crossman were stockholders, officers and employees of Robert Edwards Premium Corporation. The latter was in the business of selling and distributing items of merchandise usually called "premiums" which advertisers either give, or sell well below cost, to the purchasers of products being advertised. Robert Edwards Premium Corporation had never theretofore designed or manufactured maps of any kind. Nei-

ther had Bobley nor Crossman. The Robert Edwards Premium Corporation, however, prior to 1955, had distributed quantities of "Hammond's International Map of the World" as "premiums" to the purchasers of an encyclopedia.

Early in the summer of 1955 a salesman of the plaintiff showed "Hammond's International Globe," with the statutory copyright notice thereon, to Crossman in order to induce the Robert Edwards Premium Corporation to purchase and use the plaintiff's globe maps as "premium items." Bobley and Crossman thought the price too high and no sale was effected. Very shortly thereafter those two defendants decided to undertake the production and sale of a competing inflatable globe map of the world. From then on they moved with considerable speed. By mid-August 1955, they had commenced work, not only on the design and construction of their globe and a stand to hold it, but also on their map drawings. And, by the end of the year their competing product was ready for the market.

The defendants Crossman and Bobley together with Harold Kleinman and Edward Bobley formed the defendant, International College Globe, Inc., in December 1955. The latter thereupon took over the manufacture and commenced the sale and distribution of an inflatable globe map of the world bearing the title "International College Globe" (Ex. 9). The first such globe was sold either late in December 1955 or very early in January 1956.

The plaintiff commenced the instant suit on May 4, 1956.

Some time between the commencement of the suit on May 4 and June 1, 1956, the defendant International College Globe, Inc., on advice of counsel retained to defend the suit, changed its corporate name to "Standard College Globe, Inc." and the name of its first globe map to "The New Standard College Globe" (Ex. C). Since then the defendants have also sold and still sell through "Ideal Toy Corporation" another globe map titled "Ideal School Globe" (Ex. 10). The latter is printed from the same plates as "The New Standard College Globe" and, except for the title, is in all respects identical therewith.

During the year 1951, one George W. Poncy, an inventor who had considerable experience with plastics, conceived the idea of producing an inflatable plastic globe map of the world. He eventually designed a globe eighteen inches in diameter which is constructed by sealing the contiguous edges of twelve equally sized pieces of pliable plastic material, each of which is elliptical in form. The pieces are called "gores." At each point where the ends of the gores converge, a small disc, made of the same material, is sealed on to form a "polar cap." The disc at the "North Pole" has inserted and sealed into it a short piece of tubing containing a valve for inflating and deflating the globe and also a device for attaching the globe to a stand. The disc at the "South Pole" also has sealed into it a short tube which contains an attaching device but no valve. Poncy had neither experience nor competence in map making. He engaged Robert Winslow, a professional cartographer and part-time employee of the American Geographical Society, to draw a map for the globe. A separate drawing had to be made to show that part of the map which was to appear on each gore and disc. Moreover, the drawings had to be made on a scale appropriate for a globe having a diameter of eighteen inches. Winslow engaged Colin Landon to assist him. Winslow's compensation was to be $2,000; Landon's $100.

Winslow first laid out on "grid drawings" prepared by Landon, the outlines of a map of the world. These delineated, in addition to continents and countries, the coastal areas, mountains, lakes, rivers and such similar detail as he had decided to show on the map. He then selected approximately 3000 places, to be located and named; and, at places which he considered appropriate on his drawings, he pasted slips of paper bearing, in print of the styles and sizes he selected, the

names of these places. One of his chief sources for this data was an existing "Map of the World" prepared by the American Geographical Society (Ex. 25). Indeed it was from this map he copied onto Landon's "grid drawing" the shore lines and rivers he decided to show on the globe map. He also used as sources many other existing maps, including Exs. 17, 18, 19, 20, 25A, D, K, M, O and Q. Of these, at least one, "Nester's New Map of the World" (Ex. D), had been made by him.

Of the total time spent by Winslow in the preparation of the map, about fifty percent was devoted to tracing the outlines of continents, countries, rivers, etc., and about fifty per cent to selecting and affixing place names. The work of selection consumed approximately ten per cent of the latter period.

Every place name that appears on Winslow's drawings appears on one or another of the earlier maps which he used as a source; but no single one of those earlier maps has the precise selection of names Winslow put on his drawings.

In August 1953, Poncy having found his project too difficult and too costly for him to carry on alone, entered into an arrangement with the plaintiff by which the latter agreed to take it over, to pay Winslow's and Landon's compensation and also to buy Poncy's interest in it. Prior to the making of this arrangement, Poncy had had no connection with the plaintiff. The latter agreed to pay Poncy a regular salary until the globe was "finalized" and thereafter to pay him a royalty on each globe sold. A succession of technical manufacturing problems delayed "finalization" of the globe for almost two years after the plaintiff took over. The plaintiff expended more than $60,000 on the project.

By August 1953, Winslow's work had progressed only as far as is described above. Ashley Talbot, assistant to the plaintiff's Editor-in-Chief, reviewed Winslow's work and made a number of editorial corrections in the spelling of names and in other matters necessary to make the map and the place names conform to current political reality and Hammond's usage. Talbot devoted four hours to this work.

The plaintiff's Editor-in-Chief, Martin Bacheller, decided that thirty-eight airline routes which he specified should be shown on the map and directed James McLaren of the plaintiff's Editorial Department to do the necessary cartographic work to accomplish this. McLaren had previously shown these routes and their distances on four flat maps which appear on pages 16 and 17 of an earlier Hammond publication, "Ambassador World Atlas" (Ex. 7, id.), the "entire contents" of which were copyrighted in 1954. Nevertheless, although he had his earlier notes, it took him a week to plot the routes on great circles on the appropriate scale and work them into Winslow's fourteen drawings.

After Winslow's drawings were modified by the incorporation of Talbot's changes and the airline routes, the coloring work was added and they were then lithographed on the plastic gores and discs.

On or about August 15, 1955, the defendants engaged a professional cartographer to produce "a globe approximately 20 inches in diameter; an inflatable globe, in full color, having in excess of 3,000 names; a globe produced using 6 gores, a top and a bottom." The cartographer was Mr. Vincent F. Kotschar who formerly had been a regular employee of the American Geographical Society but who at this time was engaged in free lance work. He started to work promptly. His fee was fixed at $1,500. He had no assistant.

Kotschar first calculated the correct scale for a map which was to be reproduced on a globe made of six gores and two discs and having a diameter of twenty inches. On the basis of his calculations he made a "grid drawing" on which he then drew the map's outlines.

These delineated the continents, countries, coastal areas, mountains, lakes, rivers, and such other geographical data as he decided to show. He took most of this data from two existing flat maps of the world. One of these (Ex. N) had been produced by the American Geographical Society and the other (Ex. O) by the National Geographic Society. He also used other existing maps for the outlines of certain countries and particular areas within countries.

Kotschar had access to a large number of maps, including all of those used by Winslow, for use in selecting places to show by name. He used many of the maps Winslow used. Moreover, he had access to one "Hammond's International Globe," as well as several gores from another one which the defendants' globe maker had taken apart when he started to work on the defendants' globe.

Although Kotschar's drawings originally contained more than 3000 names, this total was reduced before the drawings were lithographed on the globe upon the orders of the globe manufacturer. The number of names shown on the defendants' globe map is just about the same as on the plaintiff's globe map, viz. 3000.

The plaintiff does not claim that everything on the defendants' globe was copied from the plaintiff's globe. The claim is rather that in certain specified areas, the defendants have copied in substantially exact detail the plaintiff's selections of unusual town or area names, and the plaintiff's unusual omissions of important names, and even the plaintiff's errors. These will be considered in detail.

The defendants' map is, as the plaintiff contends, similar to the latter's map with respect to "the angle, curvatures and positioning" of the names "Boston," "C. Cod," "Providence R. I.," "New York," "Hartford," "Trenton N. J.," "Philadelphia" and "Dover Del." Mere similarity, however, does not prove copying, and in this very crowded area there is very little room for variety as is shown by other maps, e. g. Ex. O, Ex. D. I find the defendants did not unfairly copy from the plaintiff with respect to the "angle, curvatures and positioning" of those names.

The number and selection of cities in the State of Montana shown on the defendants' map are exactly the same as on the plaintiff's map. Moreover, the defendants' map, like the plaintiff's, shows the city of Great Falls on the west side of the Missouri River. This alleged mislocation is the point most stressed by the plaintiff as proof of copying in this area. While it is true that many maps show Great Falls on the east side of the river, other maps do not. Thus the American Geographical Society map (Ex. O) shows the town astraddle the river. Indeed a 1935 National Geographic Society Map of the World in evidence as Ex. I shows it on the west side of the river. On a globe of the size here involved, the selection of towns in Montana seems to me to be what almost anyone would make. Thus mere similarity of selection does not prove copying. I find there was none with respect either to the location of Great Falls or the selection of towns.

The similarity of the positioning of "Quebec" on the defendants' map to that on the plaintiff's map does not prove copying by the defendants' cartographer Kotschar. The positioning is altogether natural in view of the space available and the size of the type used by Kotschar. This feature of the defendants' map was not copied from the plaintiff's map.

Both maps show the precisely same five towns in Greenland, four on the west coast and one on the east coast. Both maps omit the towns of Godhavn and Julianehaab on the west coast although these are more important than the towns of Ivigtut and Upernavik which are shown on both maps. The plaintiff also shows the names of fourteen areas other than towns. The defendants show the names of only nine areas other than towns. Seven of the additional areas shown are common to both maps. I find that, as to Greenland, there is a dis-

tinguishable variation between the maps of the plaintiff and the defendants.

On the defendants' map the city of Zaporozhe in the Soviet Union is shown on the northern coast of the Sea of Azov. This is incorrect. This location, however, is altogether different from that shown on the plaintiff's map. There are, moreover, several other distinguishable variations between the maps in this area. The city of Odessa, for example, is located differently on each map. The plaintiff's map shows the city of Nicolayev while the defendants' map does not. The plaintiff's map features the city of Stalingrad over the cities of Stalino and Dnepropetrovsk by the use of heavy type, while on the defendants' map the latter two are, in the same way, featured over Stalingrad.

The plaintiff's map shows six lakes in China. Five of these are also shown on the defendants' map but on the latter their configurations are noticeably different from those on the plaintiff's map. Two of the lakes which are outlined on each map are also named on each but the names, though similar, are differently spelled on each map. On the plaintiff's map the two lakes are named, respectively, "L. KOKO" and "L. TUNG-TING." On the defendants' map they are named "KOKO NOR" and "L. TUNG TING." One of the lakes outlined on both maps is named only on the defendants' map. The name is "LOP NOR." The use of the spelling "SIHSIEN" rather than "SHEHSIEN" for one of the towns common to both maps surely does not prove copying from the plaintiff. "SIHSIEN" is the form used on Ex. Q, a National Geographic Society map of the China Coast and Korea, and in the Columbia Lippincott Gazetteer. The mere selection by the defendants of this single town, even though it may be an unimportant place, hardly supports a charge of piracy. There is a distinguishable variation between the maps as respects China.

A town in Vietnam is shown on both maps on the west side of the river. On the plaintiff's map the name of the town is given as two words, "LAO KAY." On the defendants' map it is shown as one word, "LAOKAY." An earlier American Geographical Society map (Ex. 25A), listed as a source by both cartographers, shows the town on the east side of the river, and gives its name as two words. However, an earlier National Geographic map (Ex. R), used by or at least available to both cartographers, gives the town's location on the west side of the river and its name as one word, as on the defendants' map. I find the defendants did not copy from the plaintiff's map.

Both maps show a total of nine places located and named in Thailand. Only seven of these places are common to both maps. The plaintiff's map shows two towns not shown on the defendants' map, and the latter shows two not shown on the plaintiff's. There is, therefore, a distinguishable variation between the maps with respect to Thailand.

The plaintiff's map shows the locations and names of thirteen towns in Java. The defendants' map shows only nine of those shown by the plaintiff's and, in addition, one town not shown by the plaintiff. There is, therefore, a distinguishable variation between the maps with respect to Java.

Both maps omit the names and the locations of three towns in New Guinea claimed by the plaintiff to be important, and both show a town, SARMI, on the northern coast, which the plaintiff contends is not important. Both maps also show "DARU" as a town on the mainland rather than on an offshore island, which is apparently correct. Here the similarity between the maps with respect to New Guinea ceases. The location of the important city of PORT MORESBY differs quite significantly on each map. The offshore island of BIAK named by the defendants is not named by the plaintiff. The towns of AITAPE and TUFI, as well as MILNE BAY, HUON PEN and C. D'URVILLE, all of which are named on the plaintiff's map, are not

shown on the defendants' map. The word "Netherlands" on the plaintiff's map is rendered "NETH." by the defendants. The two areas designated by the plaintiff "Terr. of New Guinea" and "Terr. of Papua" are, respectively, designated by the defendants as "N.E. New Guinea" and "PAPUA." The defendants' map differs significantly from the plaintiff's.

Both maps show, on the South Island of New Zealand, the same five towns, among which are Blenheim and Westport. The inclusion of these two towns by the defendants is as consistent with independent research of the sources used by both cartographers as it is with copying, as claimed by the plaintiff. Those towns appear on Ex. 25A and Ex. O. There also appear on those source maps two other towns, Nelson and Greymouth. The plaintiff contends that these are, respectively, more important than Blenheim and Westport and would ordinarily be preferred by a professional cartographer. That view was expressed by the plaintiff's Assistant Editor-in-Chief, Mr. Talbot, but I find it unpersuasive. Mr. Talbot concededly went over Winslow's work and conformed it to current political reality. Only simple changes were necessary to show Nelson and Greymouth rather than Blenheim and Westport. I cannot believe Talbot would have failed to order Winslow to make the changes. There certainly was plenty of time for him to make them. I find the defendants did not copy from the plaintiff in respect to this area.

Seven allegedly unusual town selections in Australia are common to both maps. There do not, indeed, appear to be any compelling reasons why a cartographer would select these over others in the same general class and area. However, in addition to these seven towns and other common selections not claimed to be unusual, the plaintiff's map shows twenty-eight towns and areas which are not shown on the defendants' map. And the latter shows nineteen towns and areas which are not shown on the plaintiff's map. There is clearly a distinguishable variation between the globes with respect to Australia.

There are eight "colonies" in French West Africa, namely, Mauritania, Senegal, French Guinea, Ivory Coast, Dahomey, French Sudan, Upper Volta and Niger. The plaintiff's map does not show the boundaries of any of the colonies, and only the first five of the names listed above are shown by the plaintiff. The defendants' map shows only the same five names but it shows the boundaries of all eight colonies. In each of the colonies Mauritania, Niger, Senegal and Dahomey, the defendants omit one town shown by the plaintiff. In the case of Dahomey, PORTO NOVO, apparently an important seaport, is the only town named by the plaintiff. It is highly unlikely that a mere copyist would omit it. The defendants' omission, therefore, must have been deliberate. In the colony of French Sudan, the defendants have added a town to those named by the plaintiff. In the Ivory Coast Colony, the plaintiff names three towns of which only two are named by the defendants. In the defendants' map the town of ABIDJAN is shown on an unnamed river. On the plaintiff's map this river is not shown. The defendants' map is distinguishably different from the plaintiff's in respect to French West Africa.

Neither map names or gives the boundaries of the colonies in French Equatorial Africa. This, however, is not unusual in view of the scale of the maps. The plaintiff names eighteen places; the defendants name only fourteen. Seven of the places named by the plaintiff are omitted by the defendants, and four of the fourteen places named by the defendants are omitted by the plaintiff. The two maps are significantly different with respect to this area.

Twenty places in Algeria are named on the plaintiff's map and of these only seventeen are shown on the defendants' map. Thus the maps are different and I find the difference sufficiently distinguishes them.

The plaintiff names sixteen towns in Libya of which fourteen are also named

by the defendants. The latter, however, in five instances use spelling noticeably different from that used by the plaintiff. This hardly is consistent with mere copying. I find the maps are significantly different in respect to Libya.

The plaintiff's map names nine towns in French Morocco. The defendants also name these and one more, SALÉ. One of the town names common to both maps is spelled "FÈS" on the plaintiff's map and "FEZ" on the defendants' map. The plaintiff's spelling is the same as appears on one of the common source maps (Ex. O). The spelling used by the defendants is the same as appears on another of the common source maps (Ex. E p. 37). I find the maps significantly different.

Both maps name the same towns in Senegal and only those. This does not seem unusual in view of the size of the area and the scale of the maps. The defendants' omission of the town of ZIGUINCHOR does not, as the plaintiff contends, prove copying from the plaintiff's map which also omits it. This town is omitted on both the American Geographical Society and the National Geographic Society maps in evidence. I find there was no copying from the plaintiff.

In French Guinea both maps name the town of DABOLA and omit the town of MAMOU. This does not, as the plaintiff contends, prove copying by the defendants. DABOLA is shown on the National Geographic Society Map of the World (Ex. O) but MAMOU is not. The latter is also omitted on Ex. D which was drawn by the plaintiff's cartographer. I find the defendants did not copy from the plaintiff.

The plaintiff's map names nineteen towns in Nigeria. Only fifteen of these are named on the defendants' map but among these are the towns BIDA and BENIN. The defendants' inclusion of these two towns does not, as the plaintiff contends, prove copying from the plaintiff. Both appear on the "Nester's New Map of the World" (Ex. D) and BENIN appears on the National Geographic Society Map of the World (Ex. O). These maps were among the sources used by both cartographers. I find the defendants did not copy from the plaintiff.

Both maps name the town of MAMFE in British Cameroons and both omit BUEA, the capital, and VICTORIA, the chief seaport. The plaintiff's map names Cameroon Mt. and gives its elevation. The defendants' map does neither. MAMFE is named on at least one of the sources, the National Geographic Society Map of the World (Ex. O). BUEA is not named on any of the following sources: Ex. 25A, Ex. D, Ex. O. VICTORIA is not shown on Ex. D. Such similarity between the plaintiff's and defendants' maps as exists is certainly not unusual in view of the size of the territory and the scale of the maps, and does not prove copying. The defendants' choices are consistent with various source maps. I find the defendants' map is significantly different from the plaintiff's.

Both maps name the same three towns in British Somaliland. One is the present capital, one is the former capital and one, ERIGAVO, is the only city in the eastern part of the country shown on the common American Geographical Society map (Ex. 25A). Therefore, the selection of these towns by the defendants' cartographer is what one would expect if the plaintiff had never produced a map. There was no copying from the plaintiff.

Both maps show the town of Suez on the east side of the Suez Canal. The same error, if such it is, however, appears on an earlier American Geographical Society map (Ex. N) which was available to and probably used by both cartographers. Kotschar actually thought the town was in fact on the east side, although he admitted he is "not too well acquainted with this area." Under those circumstances he was, of course, free to check against and be guided by the plaintiff's map. I find there was no copying from the plaintiff.

The plaintiff's map names six towns in Ethiopia, the defendants' map names

seven towns. Both omit the towns of GONDAR and ADUWA, although each of these is an important town. The defendants' map differs from the plaintiff's, however, in the number of towns named and also in three other respects. It omits the name of the region "ABYSSINIAN HIGHLANDS" which is shown on the plaintiff's map. It places the town NEGELLI in a different location from that shown by the plaintiff, and it shows a river to the east of NEGELLI, which the plaintiff's map does not show. I find the maps are significantly different in respect to this area.

Both maps name the towns of BATIA-LA and HORDIO in Somalia but omit the allegedly more important towns of BENDER CASSIM and DANTE. The following source maps used by each cartographer, The Nester's New Map of the World (Ex. D), the National Geographic Society Map of the World (Ex. O) and the American Geographical Society Map of the World (Ex. 25A), omit BENDER CASSIM, and the American Geographical Society Map of the World omits DANTE as well. Two of the towns common to both maps have different spellings on each map, and each names one town which the other omits. I find the maps are significantly different in respect to Somalia.

The plaintiff on its map names twenty towns in Belgian Congo. Sixteen of these, including the unimportant town of AKETI, are also named on the defendants' map. AKETI is not named on either the American Geographical Society or the National Geographic Society Map of the World (Ex. 25A and Ex. O). It is, however, named on the map of Africa shown on pp. 64 and 65 of "Hammond's Ambassador World Atlas" (Ex. P). Although this particular volume bears a 1958 copyright notice, it was produced by the plaintiff from its files and represented to be a "complete" copy of the 1954 printing of this Atlas. The latter was one of the sources available to Kotschar. The defendants' choice of AKETI was not proved to be a mere copying of the plaintiff's globe. Moreover, the dif-

ference in the number of towns named makes the defendants' map significantly different from the plaintiff's and I find it is.

The defendants' map of Tanganyika is, contrary to the plaintiff's contention, significantly different from the plaintiff's map and I find accordingly. The defendants have omitted the name and location of MAFIA, an offshore island located and named on the plaintiff's map, and they have also omitted the towns of SONGEA and MOROGORO shown by the plaintiff. The political status of the offshore islands of PEMBA and ZANZIBAR is designated differently on each map. On the plaintiff's map it is shown by inserting "ZANZIBAR PROT." between these two names with "(U.K.)" just below "PROT." On the defendants' map the status is shown by a dotted line bracketing the islands on the west and "(U.K.)" to the east of each name.

Both maps name identical towns in Mozambique, one of which is called MAMBONE on each map. That form of the name does not appear on either the American Geographical Society map (Ex. 25A) or the National Geographic Society map (Ex. O). On the latter map the name appears as NOVA MAMBONE, but it does not appear in any form on the former map. MAMBONE is the form used in Hammond's World Atlas (Ex. E), a source available to Kotschar. The mere correspondence between the maps as to MAMBONE, even if it stood alone, would hardly prove copying by the defendants. There are several differences. The defendants have omitted C. DELGADO, the name of the Cape at the northern tip of the country, which is shown by the plaintiff. The form "MOÇAMBIQUE" is used by the plaintiff to designate that town. The defendants use the form MOZAMBIQUE. A mere copyist would hardly produce such differences. The defendants' map is significantly different from the plaintiff's.

The plaintiff's map names eleven towns and two capes in Madagascar. Only ten of the towns and one of the capes are named on the defendants' map. Both

maps omit MORONDAVA, an important town, and include ANDROKA, a relatively unimportant town. The latter, however, appears on Ex. D and Ex. O which were common source maps. The similarity of treatment of MORONDAVA does not, in view of the differences noted above, prove copying as the plaintiff contends. I find the maps are significantly different in respect to Madagascar.

Both maps show the name ARMENIA in the region of Turkey which formerly was officially known by that name. Why the defendants' similar designation of the area should be thought to prove copying from the plaintiff is hard to understand. The area is of considerable historic interest and, moreover, it is shown on two National Geographic Society maps (Ex. U and Ex. V). In any event, the plaintiff's and defendants' maps differ in many respects. The plaintiff names the towns of VAN, URFA, BALIKESIR, MANISA and ANTAKYA, which the defendants do not, while the latter name the town of ESKISEHIR, which the plaintiff does not. The plaintiff's map shows the Euphrates River expending well up into northern Turkey, while the defendants' map does not. The defendants show an unnamed lake in central Turkey, which the plaintiff omits.

The defendants' map is significantly different from the plaintiff's as respects Turkey.

Both maps show the same five towns in Iraq. Four of these, the plaintiff concedes, would be shown by every competent cartographer. It contends, however, that the defendants copied the "total selection" from it because they, too, name the unimportant town of RUTBA. The plaintiff's cartographer said he put that name in merely to soothe his "artistic sense" which otherwise would have been "jarred" by "a big empty space." The same artistic sensibilities should be attributed to the defendants' cartographer with similar consequences. I find there was no copying from the plaintiff's map.

The Copyright Act specifically recognizes maps as copyrightable material, 17 U.S.C. § 5(f), but, as with all such materials, they are subject to the requirement of originality. However, since the physical facts to be portrayed, and in most cases some actual portrayal of them, are already in the public domain, originality cannot mean novelty. A copy of something in the public domain will support a copyright if it is a "distinguishable variation." Alfred Bell & Co. v. Catalda Fine Arts, 2 Cir., 191 F.2d 99, 102, quoting Gerlach-Barklow Co. v. Morris & Bendien, 2 Cir., 23 F.2d 159, 161. "Originality in this concept 'means little more than a prohibition of actual copying.' No matter how poor artistically the author's addition, it is enough if it be his own." Alfred Bell & Co. v. Catalda Fine Arts, supra, at 103. "The elements of the copyright consist in the selection, arrangement, and presentation of the component parts." General Drafting Co. v. Andrews, 2 Cir., 37 F.2d 54, 55. By the actual labor expended in laying out the map outlines on the grid drawings, and in the exercise of judgment in the selection, from a comparison of many sources, of place names to be shown, the plaintiff's cartographer clearly produced a work which owed its origin to its author. Alfred Bell & Co. v. Catalda Fine Arts, supra, at 102. I hold the plaintiff has a valid copyright in Hammond's International Globe.

The fact that the materials used in making the plaintiff's map were in the public domain is important on the issue of infringement, since later comers are "entitled to use, not only all that [has] gone before, but even the plaintiffs' contribution itself, if they [draw] from it only the more general pattern; that is, if they [keep] clear of its 'expression.'" Sheldon v. Metro-Goldwyn Pictures Corp., 2 Cir., 81 F.2d 49, 54, cert. denied, 298 U.S. 669, 56 S.Ct. 835, 80 L.Ed. 1392.

In Millworth Converting Corp. v. Slifka, 2 Cir., 276 F.2d 443, the defendant, a fabric designer, clearly copied the outline of the plaintiff's copyrighted design.

Although the outline itself was in the public domain, the plaintiff having copied it from an embroidery, Millworth, in copying that design on a flat surface, developed an arrangement of colors which achieved the three-dimensional effect of the embroidery. That contribution by Millworth was held to be its "expression," and it was that effect which the defendant failed to duplicate and so did not infringe.

We are here dealing not with a fabric design but a map of the world and a very ordinary one at that. There is about this particular map no feature which would make it particularly useful for some specialized purpose. Nor is there the element of personal survey or observation which was present in General Drafting Co. v. Andrews, supra, or in Hayden v. Chalfant Press, Inc., D.C., 177 F.Supp. 303, aff'd, 9 Cir., 281 F.2d 543. It is a simple map of the world, designed not for technicians or persons with a specialized interest but, presumably, for young students, and to be sold at a modest price.

Putting aside, for the moment, consideration of the airline routes, and considering only the work done by Winslow, his "expression" consists of the totality of his work: cartographic outlining, selection, and presentation, that is, the positioning, spelling, etc. of names.[1] Kotschar did not copy Winslow's "expression."

It is clear from even a brief inspection of the plaintiff's Hammond's International Globe (Ex. 3) and the defendants' International College Globe (Ex. 9), that the thirty-five airline routes and distances shown on the latter are exactly the same as thirty-five of the thirty-eight airline routes and distances shown on the former. While Kotschar concededly had access to the plaintiff's globe, he also had access to all of the sources used by the plaintiff's staff. In particular, he had access to Hammond's Ambassador World Atlas and the flat maps on pages 16 and 17 therein which showed all of the thirty-eight airline routes and distances. The atlas, concededly, was the source McLaren used. Indeed he was directed by his superior to use that source. Kotschar was unable to recall whether he used the plaintiff's atlas or the plaintiff's globe but said it had to be one of them. I accept his testimony that he just could not recall. The plaintiff argues that, since Kotschar was concededly under pressure from his employers to complete his drawings, the likelihood is that he copied the airline routes and distances from the plaintiff's globe. But that is not necessarily so. Whether he used the atlas or the globe could not possibly make any difference as far as time was concerned. In either event, he had to do the mathematics necessary to plot the routes along great circle lines on his drawings which were made to a scale different from that of the plaintiff's globe. Kotschar first made a list of the airline routes he decided to show, and their distances. He could not recall whether he did this at his home or at the offices of the American Geographical Society where, at the time, he was employed. A copy of the plaintiff's globe was available to him there, but at home he had only the Hammond Atlas. I accept his testimony that he did the mathematical work of plotting at home and I find accordingly. In view of his contemporaneous employment by the American Geographical Society, it is, I think, a reasonable inference that he did all the work on his drawings for the defendants' globe at home; and that he made his list of routes and distances at home also; and that for this he used the atlas and not the plaintiff's globe. I find accordingly.

It has been said that the copyright on a compilation [2] "protects all the

---

1. General Drafting Co. v. Andrews, supra.

2. Maps, copyrightable under 17 U.S.C. § 5(f), may also be considered compilations under 17 U.S.C. § 7. General Drafting Co. v. Andrews, supra.

matter embodied therein in which copyright is already subsisting." Ball, Law of Copyright and Literary Property 105 (1944). But this means only that, because of the copyright on the compilation, no one can copy the old material *from that compilation*. It does not mean that one cannot go back to the source; that is protected only by the copyright on the original. The copyright on the compilation "shall not * * * be construed to imply an exclusive right to such use of the original works." 17 U.S.C. § 7. "Others are free to copy the original. They are not free to copy the copy." Bleistein v. Donaldson Lithographing Co., 188 U.S. 239, 249, 23 S.Ct. 298, 299, 47 L.Ed. 460 (Holmes, J.).

I hold that the defendants' globes do not infringe the plaintiff's copyright.

The plaintiff contends that the defendants competed unfairly by (1) duplicating the "size and appearance" of the plaintiff's globe; (2) adopting the word "International" as a part of their corporate name and a part of the name of their globe. The plaintiff contends further that actual confusion among the buying public has resulted. The contentions are rejected.

Surely the plaintiff can have no monopoly on the "size" of globes on which maps may be printed. The "appearance" of all globes of approximately the same size will necessarily be the same except in so far as their colorings may vary. However, the range of color variety is, by custom, limited; especially in a cheap map produced for general use. Here the defendants have succeeded in making their globe distinguishable by its colorings from the plaintiff's.

The ocean areas of the defendants' globe are of a darker blue than those of the plaintiff's globe. The latitudinal and longitudinal lines on the plaintiff's globe are white and noticeable only upon a close inspection in the ocean areas, and black in the land areas. On the defendants' globe they are black in all areas. In addition, the plaintiff's globe shows only every 15th meridian, while the defendants' globe shows every 10th meridian. The land areas are, for the most part, colored differently on each globe. For instance, the land mass of the U.S.S.R. is a pale, green-bordered color on the plaintiff's globe, and pink on the defendants' globe. China is approximately the same color on each, but Mongolia and India are purple on the plaintiff's globe and yellow on the defendants' globe. In the Western Hemisphere, Canada appears in a pinkish color on each globe. It is matched on the plaintiff's globe by Cuba and Peru and, on the defendants' globe by Cuba, Peru, Bolivia and Argentina. The United States is a yellowish color on each globe, matched in each case by Brazil. However, Mexico is more sharply distinguished from the United States on the plaintiff's globe, having an orange color, than on the defendants' globe, where it is nearly the same yellow.

Similarity of appearance is also predicated on the defendants' use of red as the color of the tube at each pole. This contention is rejected. The plaintiff has no protectible interest in such a common color. Norwich Pharmacal Co. v. Sterling Drug, Inc., 2 Cir., 271 F.2d 569, 573 (pink); James Heddon's Sons v. Millsite Steel & Wire Works, D.C., 35 F.Supp. 169, 174, aff'd, 6 Cir., 128 F.2d 6, cert. denied, 317 U.S. 674, 63 S.Ct. 79, 87 L.Ed. 541 (1942) (red). The valves themselves, of course, are not nonfunctional features whose copying could give rise to a complaint; as plaintiff admits in its trial memorandum, they "serve the function of being pivotal pieces for the frame mounting."

Of all the words which might be applied to a map surely there would be few more descriptive than "international." Indeed the plaintiff's president so regarded it. He said it would be "inappropriate" to use the word in the title of any map other than a world map, and

that the plaintiff never did so. He conceded also that at least one other publisher of atlases used "International" in their titles. I hold that the word "International" as applied to world maps, globes, atlases, etc. has not acquired a secondary meaning indicating a single source of such publications.

■ The evidence of actual confusion introduced by the plaintiff does not require a contrary holding. This evidence consisted of letters to the plaintiff from the purchasers of ten of the defendants' globes. The letters sought from the plaintiff either return of the purchase price or the repair or replacement of globes not issued by the plaintiff. This indeed showed confusion. But it is impossible to charge such confusion to the defendants' use of the word "International" in their original corporate name or in the title of the first edition of their globe. As far as appears, not a single one of these ten globes bore the title "International College Globe." And none showed "International College Globe, Inc." as its producer. They were all globes produced by the defendants after June 1, 1956, when both their corporate name and the title of their globe were changed. Six bore the title "New Standard College Globe" and in addition showed the publisher to be Standard College Globe, Inc. Three bore the title "Ideal School Globe" and showed the publisher to be Ideal Toy Corporation.[3]

I hold that the defendants have not competed unfairly with the plaintiff.

■ The defendants may submit, on notice, a decree in accordance with this opinion. Counsel fees are not allowed the defendants, as a matter of discretion. There is neither claim nor proof that the plaintiff has harassed the defendants and no reason to doubt the plaintiff's good faith in bringing this suit has been suggested or shown.[4]

3. See American-Marietta Co. v. Krigsman, 2 Cir., 275 F.2d 287.

4. See Edward B. Marks Music Corp. v. Continental Record Co., 2 Cir., 222 F.2d 488.